UNITED STATES of America, Plaintiff,

v.

Ronald L. SCOTT, Defendant.

UNITED STATES of America, Plaintiff,

v.

Charles THOMAS and Melvin Cooper, Defendants.

Nos. 89–CR–70, 89–CR–66.

United States District Court,
E.D. Wisconsin.

Feb. 22, 1991.

Maxine White, Asst. U.S. Atty., Milwaukee, Wis., for U.S.

Mark Pumpian, Milwaukee, Wis., for Ronald L. Scott.

Charles Blaha, Milwaukee, Wis., for Charles Thomas.

Debra J. Patterson, Milwaukee, Wis., for Melvin Cooper.

### DECISION AND ORDER

TERENCE T. EVANS, District Judge.

The federal sentencing guidelines have been in effect since November 1, 1987. Since then, a steady chorus of district judges [1] all over the country have raised serious doubts about their wisdom. One judge, A. Lawrence Irving, of San Diego, a 1982 appointee of President Ronald Reagan, resigned his commission over them. In my opinion, there is no other issue in the federal court system that has bothered the judges as much as the sentencing guidelines. These cases, especially the one involving Ronald Scott, illustrate some of the problems with the guidelines.

Judges are unhappy with the guidelines for several reasons. The major sin of the guidelines is that they all but eliminate the ability of the judge to consider cases on an individual basis. Individualized justice, which should be the due of anyone convicted in an American courtroom, has been replaced with a system of grids, points, and

---

**1.** I don't believe that circuit judges are any more enamored with the guidelines but, being a district judge, the comments in this decision will focus on the guidelines from that perspective.

mindless absurdities. In some cases, judges are required to impose sentences under the guidelines that are too lenient. In other cases, the guidelines require the judges to impose sentences that are too harsh. In all of this, the stated goal of the guidelines—to get rid of disparity in sentencing—remains illusive. In my view, just as much disparity in sentencing exists today as existed before the guidelines went into effect. Now to the two cases at hand.

Mr. Scott in case 89–Cr–70 and Charles Thomas and Melvin Cooper in case 89–Cr–66 must be returned to court for further proceedings. In each case I gave the defendants sentences that exceeded the range established by the guidelines. The sentences imposed were judged to be too high by the court of appeals,[2] so the cases were sent back to me for resentencing. If the guidelines were not in effect, these cases would be closed. Because of the guidelines, these defendants will soon be returned to court and resentenced to terms of imprisonment, probably substantially shorter terms of imprisonment, than the ones I originally imposed.

Mr. Scott was convicted of violating 18 U.S.C. § 922 and 26 U.S.C. § 5861. The charges were "felon in possession of a firearm" and "possession of an unregistered firearm." The sentencing range for Mr. Scott under the federal sentencing guidelines was 10 to 16 months in prison. I gave him 5 years. And even that was less than I wanted to give him. When I sentenced Mr. Scott I said,

> And even going through this the most I can give you is, rounded off, five years. And I think you should know, Mr. Scott, that if I wasn't required to adhere somewhat to the guidelines in this case I would give you more time than I'm giving you.

So the 5–year sentence I ordered in Mr. Scott's case has been determined to be too stiff. Given the facts of this case, that's a rather sad commentary on the state of the law. The facts illustrate some reasons why the guidelines, with their grids, rigid procedures, and magic words that must be entoned when engaged in the real-life drama of courtroom sentencing, have caused the sentencing system in federal court to go haywire.

Had Mr. Scott committed the offenses in this case prior to November 1 of 1987, he would have been sentenced pursuant to a sentencing system that existed in this country ever since "inferior" (to use the constitutional name for district and circuit courts) courts were created. Under pre-guideline law, Mr. Scott would have faced a maximum penalty of 10 years in prison on each of the two counts. In my view, he would have been a candidate for the maximum sentence. The reasons why I would have treated him rather harshly follow.

We know from the charge, felon in possession of a gun, that Mr. Scott is not a first-time visitor to the criminal courts. He must have a prior felony conviction to be eligible for the charge against him. As a starting point in judging Mr. Scott, I would have looked at the prior underlying felony conviction to determine how serious it was. If the prior conviction was for a crime that is mundane and nonviolent, like embezzling $1,000 from a bank, I would have looked more kindly upon Mr. Scott. His prior conviction, however, was a doozie. He was convicted of delivery of cocaine and possession of cocaine with intent to deliver it. The underlying offense was committed when he sold a packet of cocaine to an undercover Milwaukee police officer. Upon his arrest, 10 additional packets of cocaine were found in his possession.

Next, as the sentencing judge in a pre-guideline case, I would have looked at when the underlying conviction was entered. Was it an old, stale conviction? Was it one that was relatively new? Here, Mr. Scott's prior conviction was entered on April 11, 1986. He was discharged from that conviction on April 3, 1988, a scant 1 year prior to his arrest in this case, which occurred on April 14, 1989. The closeness

---

**2.** *United States v. Scott,* 914 F.2d 959 (7th Cir. 1990); *United States v. Thomas,* 906 F.2d 323

(7th Cir.1990).

in time between the prior conviction and his current brush with the law would have been another strike against Mr. Scott.

Because the new offenses involved firearms, I, as the sentencing judge in a pre-guideline case, would have looked at what kind of weapon was involved. If the weapon had been a rifle, arguably usable for sporting purposes, I would have viewed the case differently than I would have viewed it if the weapon turned out to be one that had no noncriminal use. The weapon Mr. Scott possessed was a loaded 20-gauge sawed-off shotgun. Obviously, this weapon was not possessed for quail hunting in South Bend, Indiana. It's a scary weapon of destruction used only to blow people away. No one should possess a firearm of this sort.

The next factor I would have considered, as the sentencing judge in a pre-guideline case, would have been something I would generally put under the category of "What kind of a fellow is this Ronald Scott?" I would have concluded that Mr. Scott was no boy scout. At the time of his arrest, Mr. Scott was wearing the six-pointed star pendant which identifies him as a member of the "Black Gangster Disciples," a Chicago street gang affiliated with the Milwaukee street gang, Brothers of the Struggle. I would have also noted that he was regularly cavorting with Brothers of the Struggle gang members like Charles Thomas and Melvin Cooper, the two defendants in the second case I will be talking about in this decision. He had received cocaine from Mr. Thomas just 1 week prior to his arrest. I would also have noted, as I did when I originally sentenced him, that Mr. Scott was "running in and out of more drug houses ... than you can shake a stick at." Obviously, Mr. Scott would not have received high marks for character.

Lastly, as the sentencing judge in a pre-guideline case, I would have looked at Mr. Scott's conduct between his arrest and the date that I sentenced him. His conduct was miserable. Although Mr. Scott denied using any illegal drugs for the 6-month period prior to the date that I sentenced him, urine specimens taken from him demonstrated that this was not true. On two occasions he tested positive for both cocaine and marijuana. And, to add insult to injury, Mr. Scott failed to appear in court for sentencing on September 5, 1989, and a warrant for his arrest had to be issued. He remained at large until October 10, 1989, when he voluntarily surrendered to federal agents.

From all of this, I would have easily concluded that Mr. Scott was a prime candidate to receive a sentence at or close to the maximum provided by law. He would have received that kind of sentence if this had been a pre-guideline case. But because of the guidelines, and the close scrutiny given to these cases by appellate courts, Mr. Scott must now be resentenced under a system that says an appropriate disposition of his case would be a penalty within a range of 10 to 16 months in prison. That's disheartening.

I now turn to Messrs. Cooper and Thomas. I won't spend much time on their cases, as they raise issues similar to those presented in Mr. Scott's case. A review of the Thomas and Cooper matters follows.

Mr. Thomas was sentenced after being convicted of (1) being a felon in possession of a firearm, (2) possession of cocaine with intent to distribute, and (3) using a firearm in connection with a drug trafficking crime. The guidelines set his sentencing range at 21 to 27 months.

Mr. Cooper was convicted of (1) possession of an unregistered firearm, (2) possession of cocaine with intent to distribute, and (3) using a firearm in relation to a drug trafficking crime. His sentencing range, under the guidelines, came out to 24 to 30 months.

Having determined that a sentence within the guidelines would be ridiculously low, I sentenced Mr. Thomas to serve a term of 30 years and Mr. Cooper to serve a term of 15 years. When they are returned for resentencing, their sentences will be much closer to the guideline range. That will be regrettable, for both of the gentlemen, particularly Mr. Thomas, deserve a greater penalty.

Let's look now at what they did and why a penalty within the guideline ranges would be inadequate.

During the evening hours of November 9, 1988, Milwaukee police officers stopped an automobile in which Mr. Thomas was a passenger. One of the officers shined a flashlight inside the automobile and saw Mr. Thomas holding a weapon between his legs. The weapon was retrieved. It was a loaded .357 Magnum. The gun had been reported stolen to the Milwaukee Police Department some years before.

Mr. Thomas, of course, had a prior felony conviction (I'll get to that later). He was charged with being a felon in possession of a firearm. Exactly 5 months later, on April 9, 1989, a rather chilling incident occurred which again brought Mr. Thomas (who was out on bail) to the attention of the police. This time, Mr. Cooper also appeared on the scene. The events of April 9 had their beginning 3 days earlier, on April 6, when Milwaukee police officers went to the area of 25th and Atkinson in Milwaukee to investigate information that cocaine was being sold out of a drug house there by members of the Brothers of the Struggle street gang. A confidential informant had told the police that several BOS gang members were involved in selling drugs in the house and that the group included Mr. Cooper and Mr. Thomas. The informant told the police to be careful because the occupants of the drug house were "heavily armed." The informant also reported that Mr. Cooper had been seen at the house carrying a TEC–9 pistol.

On April 9, the officers approached the drug house and observed Mr. Cooper standing in front of a large window on the second floor holding a sawed-off shotgun. Sawed-off shotguns, as we know from Mr. Scott's case, are the weapons of choice for members of the BOS gang. Cooper pointed the weapon in the direction of the officers but eventually dropped the shotgun out of the open window. A few seconds later, a baggie containing cocaine also flew

out the window. When the officers entered the house, they arrested Cooper and Thomas, who were in the living room. In their vicinity, the officers seized an Intratec, model TEC–9, 9 mm semiautomatic pistol. It was loaded with 27 rounds of ammunition. Next to the pistol was a silencer threaded to fit the gun. Also found in the room were two boxes containing 36 rounds of .38 caliber ammunition and 22 rounds of 12–gauge ammunition. One box containing 27 rounds of .32 caliber ammunition was found in the living room along with the tools of the cocaine business—baggies, paper bowls, a screen strainer, a bottle of cutting agent, and an empty box[3] for a Deering gram scale. Not much else was found in the sparsely furnished abode, which was obviously used only as a drug house. After his arrest, Thomas admitted being a member of the Brothers of the Struggle. He stated that he came to Milwaukee from Chicago in May of 1988 and had participated in selling cocaine from that date until he was caught in April of 1989. He admitted that he had been selling drugs out of the drug house at a rate of about 6 ounces per week, netting a profit of approximately $900 each week.

Mr. Thomas's prior record was horrid. In 1984, at the age of 19, he was convicted of robbery in Chicago and placed on probation. His probation was "terminated unsatisfactorily" on August 28, 1986, when he was convicted of burglary in Chicago. He received a short prison sentence, was paroled in May of 1987, but rearrested in August of 1987 for possession of burglarious tools. His parole was revoked and he was sent back to prison. He was reparoled and under parole supervision when he moved to Milwaukee prior to his first arrest here in November of 1988. When he arrived here, it seems, he went right into the cocaine business. This review of his record omits Mr. Thomas' juvenile troubles. As a kid, he was adjudicated as a delinquent in Chicago for attempted murder. He did 23 months as a guest of the state of Illinois at the St. Charles' Boys School.

---

**3.** While the arrest was taking place, Mr. Cooper's 16–year-old cousin, Kentric Winters, walked into the drug house carrying the Deering gram scale. He was searched and found to be carrying nine neatly folded packets of cocaine.

Given the serious crimes Mr. Thomas committed here and the poor record he managed to accumulate in a very short time in the Windy City, I was shocked to learn that the guidelines told me he should be sentenced to a period of between 21 and 27 months in prison. To me, Mr. Thomas appeared at this point in his life to be a no-goodnik who needed a *substantial* prison term to correct his bad habits. However, it now looks like he won't be getting one.

I won't say much about Mr. Cooper, who essentially denied that he did anything wrong. To believe him, one would have to believe that he ended up in the drug house by mistake, thinking perhaps that it was the Ronald McDonald House. At any rate, it was my view that the serious nature of this case called for a lengthy sentence to be imposed on Mr. Cooper, certainly one substantially longer the 24 to 30 months established by the sentencing guidelines.

When I originally sentenced Messrs. Thomas and Cooper I made a number of statements which were reprinted in the opinion of the court of appeals. I said:

[T]he guidelines ... totally, completely underestimate the seriousness of this particular set of criminal charges.

... I think it's a case that a message should be sent to others who are thinking about this kind of gang activity. A message should be sent to people who run drug houses and pedal this terrible stuff to others which is being used to destroy the lives of people. A message should be sent to people who possess these weapons of destruction. A message should be sent to gang members that very serious consequences will fall if you persist in that kind of activity.

At the original sentencing hearing I also referred to the fact that the guidelines did not address the serious crime problems presented in urban communities like Milwaukee [4] where violent gang activity is increasing and the homicide rate is soaring. In reversing the sentences that I imposed,

the court of appeals observed that under the guidelines, "[c]ourts are not free to base sentencing on purely local conditions such as the degree of violence in Milwaukee." If the court of appeals says it, it must be so, but it certainly is a poor reflection on the wisdom of the sentencing guidelines if these kinds of things cannot be considered by judges when imposing sentences in criminal cases.

Leaving these cases, I turn to a few observations (not an exhaustive discussion, however) about other problems I see under the guidelines. One of the problems is that the kind of appellate review that seems to be required under the guidelines forces circuit judges to deal with trivial niceties and nuances that border on nitpicking. Distinctions are made between cases, and many interpretive efforts seem to be little more than an exercise in splitting split hairs. Many recent decisions illustrate this point, and *United States v. Bierley*, 922 F.2d 1061 (3d Cir.1990), is one of them. That case concerned the travails of Jack Bierley as he wandered through the guideline maze on his way to a prison somewhere in Pennsylvania.

Jack Bierley purchased a magazine, *Video Mania,* and saw an ad in it that caught his eye. The ad read:

Wanted: Collector of rare, amateur erotic hard-core videos. Seeking to buy, sell, trade same. W.R. Simpson, 1579–F, Monroe Drive, N.E. 803, Atlanta, Georgia 30324.

Bierley responded to the ad, writing to "W.R. Simpson" and saying he was interested in "non run-of-the-mill" and "offbeat" material, including "young stuff." Simpson sent a letter back to Bierley stating that magazines such as *Lolita* and *Nymph Lover* were "what I have and what I am looking for."

Correspondence between Bierley and "Simpson" continued, but unbeknownst to Bierley, he was falling into a trap. "Simpson," you see, was an undercover government postal inspector trying to lure

---

**4.** A record (at the time) 83 homicides were committed in Milwaukee in 1986. In 1990, the record doubled, to 165. In contrast, only 17 homicides were committed just a few decades ago in 1960.

customers of child pornography (or perhaps any kind of pornography) out into the open. Bierley became lured. After exchanging a number of letters over several months Bierley ordered four magazines—which contained what the government agent promised would depict sexual activity of young subjects. Simpson sent them in a plain brown padded envelope. Shortly after the envelope arrived at Bierley's house, a bevy of postal inspectors also arrived—with a search warrant. They searched Bierley's home and recovered no child pornography, save for the four magazines sent there by the government. Bierley was charged with and pled guilty to receiving child pornography through the mail. That was the easy part of the case. Next came Mr. Bierley's sentencing.

Under the guidelines, Bierley's base offense level was 13. He got hit with two extra "points" because the magazines the government sent to him included pictures of minors but got the two points back for "acceptance of responsibility" by admitting his guilt. So he was back where he started at offense level 13. Because he had no criminal record, he was in criminal history category one. His guideline range, therefore, was 12 to 18 months in prison. The district judge sentenced Bierley to 12 months, the low end of the guideline range, after denying an adjustment under U.S.S.G. § 3B1.2 for a "mitigating role" in the offense and ruling he could not depart downward for "mitigating circumstances." Next stop, the court of appeals.

The appellate court affirmed the denial of the section 3B1.2 adjustment. It agreed with other circuits that have held that "role in offense" adjustments require other "participants" who are "criminally responsible." *See, e.g., United States v. DeCicco,* 899 F.2d 1531 (7th Cir.1990); *United States v. Gordon,* 895 F.2d 932 (4th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990); *United States v. Carroll,* 893 F.2d 1502 (6th Cir.1990). (*But see United States v. Anderson,* 895 F.2d 641 (9th Cir.1990), which held that section 3B1.1(c) may be applied when a codefendant was tricked into committing the offense). The court reasoned that Bierley was the

only "participant" in this crime because Simpson, a government agent, was not "criminally responsible."

The court held, however, that a departure could be made "by analogy" to section 3B1.2, stating:

> If the Guidelines authorize departure in "an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm," Ch. 1, Pt. A, 4(b), a fortiori they authorize departure in an atypical case where an adjustment would otherwise be authorized for the same conduct but, for linguistic reasons, the adjustment Guideline does not apply. That is to say, the fortuitous fact that § 3B1.2 linguistically could not apply to [defendant] because [the undercover agent] was not a criminally responsible "participant" does not render [defendant's] conduct significantly different from that of a defendant in similar circumstances who might qualify for an offense role adjustment.... [W]e hold that when an adjustment for Role in the Offense is not available by strict application of the Guideline language, the court has power to use analogic reasoning to depart from the Guidelines when the basis for departure is conduct similar to that encompassed in the Role in the Offense Guideline.

The court of appeals for the Third Circuit "emphasize[d] the limited nature of the departure" it authorized: it applies only where there is one "participant" because with more "there can be no departure by analogy because the adjustment guideline is applicable of its own force." In remanding, after writing a decision that takes almost an hour to read, the court noted that Bierley "is only entitled to a departure by analogy ... if the district court finds that he would have been entitled to [a § 3B1.2] adjustment had [the undercover agent] qualified as a participant." Also, any departure "would be limited to the 2 to 4 level adjustment downward on the bases set forth in § 3B1.2." Because of this pronouncement the new sentence for Mr. Bierley after the remand, if less than 12

months, will be selected from a range of either 8 to 14 or 4 to 10 months. One can't help but wonder if the *Bierley* case, particularly the sentencing, is worth all the time and effort it took to get it back before the district judge for more proceedings.

The *Bierley* case is not unique in its resort to linguistic gymnastics in guideline cases. Cases like it are reported every day. Just one week ago, on Valentine's Day, the court of appeals for this circuit delivered *United States v. Poff*, 926 F.2d 596 (7th Cir.1991), where the court-sitting *en banc*—had to decide if, under the guidelines, a "crime of violence" can also be a "non-violent offense." Six circuit judges said "no," and five said "yes." This result was announced 10 weeks after the case was orally argued.

Elongated proceedings under the guidelines are choking the federal system at all levels. At the district level, even minor cases take more time as the following letter I sent to two lawyers in a recent case demonstrates. The letter, written in *United States v. Patricia Navarrette,* is reprinted here in full.

January 29, 1991

Mr. R. Jeffrey Wagner
United States Attorney's Office
330 U.S. Courthouse
517 East Wisconsin Avenue
Milwaukee, WI 53202

Mr. Waring R. Fincke
Dvorak & Fincke, S.C.
823 North Cass Street
Milwaukee, WI 53202

Re: *United States v. Patricia Navarrette*

Case No. 89–Cr–229

Dear Counsel:

I had not planned on responding to the letters I received following Patricia Navarrette's sentencing, which occurred on Monday morning, January 14. The letters included one from Mr. Fincke on January 15, one from Mr. Wagner on January 18, and another one from Mr. Fincke on January 25. Although my first reaction was to not respond, the letters suggest that the matter is not going to be put to rest without my saying something, so I thought I should drop you a note and tell you how I feel about the case.

No matter which way you look at it, the Navarrette matter is not a major case. For penalty purposes, viewed in the light most unfavorable toward Ms. Navarrette, the offense level here is 12, and the guideline range, given the fact that she has no criminal record, is only 10 to 16 months. Because the minimum is 10 months, the guidelines could be satisfied by a sentence of 5 months incarceration followed by 5 months of home detention. Considering the kind of sentences that are usually meted out around here, it is clear that Ms. Navarrette's sentence would have been minimal, even if I took an unfavorable view toward her.

During the hearing on January 14, I gave Ms. Navarrette a 2–point reduction for acceptance of responsibility. That brought her range down to 6 to 12 months. The guidelines then could have been satisfied with a period of 3 months incarceration followed by 3 months of home detention. I departed downward from the guidelines and put Ms. Navarrette on probation because of her physical/mental condition.

I don't have before me the record that was made on January 14. Mr. Fincke may very well be correct in his position that more specific findings should now be entered because the government wants to appeal. But I don't want to do that at this time. I think the better course would be to have the court of appeals review the situation and decide if more is necessary, given the minimal nature of this case.

I would like to think that the court of appeals would not even want to get involved with a minor matter like this. I guess I would like to think that the court of appeals would recognize that a busy trial court simply does not have the time to make detailed findings on little cases like this. I would like to think that the court of appeals would consider the context in which this case was called for sentencing. In that regard, I would hope

that the court of appeals would note that Ms. Navarrette was not the only defendant sentenced by me on the morning of Monday, January 14. Two other defendants were sentenced that morning—Randy Wellens in case 90–Cr–94, and Glenn Deppe in case 87–Cr–155. The Wellens and Deppe cases were more serious matters. Mr. Deppe was sentenced to 12 years in prison and Mr. Wellens received something in the area of 4 years. Neither Deppe, Wellens, nor the government will be appealing. I point out these other cases because the court of appeals should know that it takes a lot of time to sentence people, and that when I was conducting the three sentencing proceedings on Monday morning, January 14, I had a jury waiting in the jury room ready to come back into court to start day 3 of a multidefendant, multicount cocaine conspiracy trial that was destined to continue for 8 more days. Even though I was going as quickly as I was able to go, I still was not able to turn my attention to the jury trial until around 10:45 in the morning of January 14. Because the three sentencing hearings took so long, the jurors and lawyers waited for approximately 1 hour before I could get back to their case.

So, I think it's important to put these kinds of sentencing proceedings in context. If there is an appeal here, maybe the court of appeals will consider the entire situation and conclude that it doesn't warrant too much attention. The worst that could happen is that the case will be remanded for the purpose of making a fuller record. I will then try to dot all the i's and cross all the t's to make the reasons why I declined to incarcerate Ms. Navarrette more clear. So both of you will know what those reasons are if I ever have to recall this case and make a more complete record, here's a summary.

Ms. Navarrette's mental and emotional health is very fragile. According to the presentence report, she has contemplated suicide on at least three occasions, and she currently suffers from what appears to be a rather serious case of anorexia nervosa and depression. The presentence report, in this regard, states:

Dr. Kaehler reveals the defendant has been in treatment since 2/5/90, when she was hospitalized for anorexia nervosa and dysthymic disorder. The doctor believes her prognosis is guarded because of the chronicity of her eating disorder and the chronic nature of her depression. The doctor further believes incarceration for Ms. Navarrette would be a major setback and could endanger her physical health if her anorexia nervosa worsened.

My personal observations of Ms. Navarrette when I sentenced her on January 14, caused me to conclude that her condition was serious. She is very nervous, fragile, and shaky. I thought that if she were imprisoned, she would completely come apart. Also, her admirable efforts to rid herself from the drug demon that possessed her—see paragraphs 53 to 55 of the PSR—would in my view be endangered if she were sent to jail for 5 months at this critical time in her life.

Given all of this and the nature of the charges against her—she told a lie to protect her cousin, who was ultimately convicted on a plea of guilty and sent to prison—I decided to go below the guidelines in Ms. Navarrette's case. Given the bulging federal prison population, it would, in my view, not serve the interests of justice to add this 31–year–old nervous wreck to the pile. Ms. Navarrette was involved in a nonviolent offense in a misguided and unsuccessful effort to help her cousin. Given her fragile condition, probation is a just and, in my view, a proper sentence in her case.

For these reasons, I will not conduct any formal further proceedings in this case at this time.

Very sincerely yours,
Terence T. Evans
United States District Judge

Now, I have nothing against a general scheme that gives either side of a criminal case a right to appellate review. In fact, even though no recognized scheme for ap-

pellate review of sentences existed before the guidelines, I think it is a good thing.

But the review system should be much simpler. It should recognize the real-life climate in which sentencing, in a crowded court, occurs. As noted in the Navarrette letter, the sentencing proceeding is often sandwiched in between several other cases—civil and criminal—and conducted while jurors, witnesses, and lawyers are waiting impatiently to resume proceedings in a continuing trial. Under the guidelines, sentencing proceedings are taking far too much time. My colleague, Judge J.P. Stadtmueller, has been keeping track of the time, and he notes that his guideline sentencing proceedings have taken an average of 2 hours and 20 minutes. One even took 3 days. His quickest proceeding still required 29 minutes. As one can see, the time invested in these proceedings is significant. No system of appellate review should ignore the time investment that goes into these cases. To repeat and re-do proceedings to fine tune sentences is a luxury I don't think the courts can afford.

Were I designing a new system of appellate review, I would urge one where three judges (circuit, district, or a combination) would simply look at the case and read the presentence report against an "abuse of discretion" or a "did the judge do something totally whacky here" standard and either affirm or reverse without writing fact specific decisions. If they reverse, I think the appellate judges should then set the new sentence. The case should end at that point rather than go back to the district court. But a system like this would be too simple—it would never work. Many judges and lawyers (rarely does anything get simpler after it's turned over to someone who went to law school) would be reluctant to even consider a new sentencing paradigm that required less, rather than more, complexity. But I think we do ourselves a disservice by making an overburdened and complex system more overburdened and more complex. That's what the guidelines have done.

I could go on and on lamenting the shortcomings of the guideline sentencing system under which we now must function. I won't, however, continue to harp as this decision is already too long. I close with a short comment regarding "disparity," a point I briefly mentioned on page 973. There I said, "[t]he stated goal of the guidelines—to get rid of disparity in sentencing—remains illusive. In my view, just as much disparity in sentencing exists today as existed before the guidelines went into effect."

Guideline sentencing, in drug cases, is quantity driven. Punishment is becoming mechanical: 10 years for 11 pounds of cocaine, 5 years for 1 pound. These punishments, and other judgments made by the unelected seven-person "Sentencing Commission," were arrived at, it seems, in a haphazard fashion, as reported by Tracy Thompson and Michael Isikoff of the *Washington Post*.[5]

"The way in which these sentences were arrived at—it was like an auction house," recalls Eric Sterling, a staff member on the House Judiciary Committee when the laws were being written. "It was this frenzied, panic atmosphere —I'll see your five years and I'll raise you five years. It was the crassest political poker game. Nobody looked and said these sentences are going to have the following effect on the courtrooms around the country, on street corners and on the prisons."

Because guideline sentencings in drug cases are quantity driven, "disparity" is cropping up all over the place. The result is that sometimes big-time drug offenders get less than two-bit players. It was this situation that caused Judge Irving to resign and another district judge to "wonder, only half jokingly, whether in years to come he and his fellow jurists will have to assert the Nuremberg Defense—'I was only following orders'—to justify the number of people they are sending to prison for decades."[6]

5. The *Washington Post* national weekly edition, December 10–16, 1990, p. 25.

6. *Ibid.*

How do big dealers get breaks while people who are merely small potatoes suffer? It's easy under the guidelines. Under the law as it now stands, a judge is allowed to give a more lenient sentence than the statutory minimum only if the prosecutor files a motion saying that a defendant has rendered "substantial assistance to the government" in nailing other drug suspects. But only high-level traffickers can provide such help; the couriers usually know next to nothing. "There is an inequity for the person who can't deliver the goods," says Peter Djinis, a former Justice Department narcotics prosecutor.

The result, says Judge Irving, is the kind of disparate sentences he imposed last October. A bit player in a marijuana smuggling conspiracy that ultimately went awry—no drugs were ever imported—received 10 years. The ringleader, who after being arrested cooperated with the government and fingered other drug dealers, got 4½. "That was the biggest joke of all," says Irving. "The first guy is the first-time, poor offender, and he doesn't know anything.... The other guy sang like a canary" and got a substantially reduced sentence.

We in the trenches have lived with these guidelines now for a little over 3 years. They are simply not working. Hopefully, the Congress will soon come to view the guidelines as an experiment that didn't work. If that doesn't happen and the guidelines remain in effect, the federal court system—which today has a hard time fulfilling its obligations in civil cases—will continue to slip further behind the eight ball.

As for Messrs. Cooper, Thomas, and Scott, their cases will be recalled soon. The dates and times will be:

Thomas—February 28, 1991, at 8:30 a.m.

Cooper—March 13, 1991, at 8:30 a.m.

Scott—March 13, 1991, at 9:30 a.m.

SO ORDERED.