UNITED STATES of America,
Plaintiff–Appellee,

v.

William M. CARROLL,
Defendant–Appellant.

No. 88–2260.

United States Court of Appeals,
Sixth Circuit.

Argued July 31, 1989.

Decided Jan. 9, 1990.

David Debold, argued, Office of the U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Jill L. Price, argued, Federal Public Defenders Office, Detroit, Mich., for defendant-appellant.

Before KRUPANSKY and RYAN, Circuit Judges, and WILHOIT, District Judge.[*]

RYAN, Circuit Judge.

This sentence guidelines appeal presents a meritorious assignment of error.

Because we conclude that the sentencing court erred as a matter of law in selecting the numerical value corresponding to the defendant's "role" in the offense in this case, and as a result necessarily came to a mistaken mathematical conclusion about the appropriate sentence guidelines range, we vacate the sentence and remand the case for resentencing.

## I.

Before turning to the four meritless and one meritorious issues in this appeal, we should like to say a word, in dicta to be sure, about the ever increasing volume of sentence guidelines appeals being filed in this circuit, and presumably in others.

This is one in an ever increasing number of such appeals in which the principal thrust of the appeal is to attempt to persuade this court to second guess the sentencing judge's findings about the nature of the defendant's role in the offense, or his attitude about his guilt, or his criminal justice history; and sometimes, as in this case, all three.

This appeal is unusual in that it presents a meritorious assignment of error. In most of these appeals the sentenced offender is the appellant and his sole appellate purpose is obvious: to obtain a more lenient sentence than was imposed by the district court. When the government is the appellant, as it is with increasing frequency, its purpose, ordinarily, is to obtain a more severe sentence.

The usual request in these appeals is that we substitute our own findings of fact for those of the sentencing court and then recompute the "correct" sentence guideline range by introducing into the convoluted arithmetical sentencing guidelines formula different numerical values for the defendant's role in the offense, his attitude, and his criminal history than the sentencing court, and usually the probation department, thought to be appropriate. To characterize this use of the resources of the United States Court of Appeals as imprudent is a very considerable understatement.

As the burgeoning volume of these sentence guidelines appeals begins to bloat the dockets of all the courts of appeals, we are necessarily spending more and more time doing nothing more than responding to appellants' pleas that we disagree with the factual determinations of sentencing judges and correct their mathematical computations. In the vast majority of these cases, although not this particular one, after careful and exhaustive examination of the sentencing court's findings of facts and

[*] The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation.

its arithmetical computations, our appellate scrutiny results in a conclusion, even where some minor mathematical mistake is identified, that the correct sentence range is exactly as determined by the sentencing court. Part of the price that is paid for this kind of appellate drill is the unwarranted consumption of considerable time and energy that should be devoted to study, research, decision making, and opinion writing in an accumulating backlog of cases involving hundreds of jurisprudentially significant questions of state, federal, and constitutional law—functions for which the United States court of appeals was created.

It is not too late for Congress to reconsider whether the time and resources the courts of appeals are devoting to reviewing these sentence guideline cases, particularly in view of the essentially clerical nature of the current review function, can be better spent without sacrificing a sentenced defendant's entitlement to *appropriate* appellate review of the sentence imposed.

Meanwhile, we shall continue to undertake, as we have in this case, a detailed analysis of the correct application of the guidelines to the facts of individual cases in the hope that doing so will contribute to an early accumulation of a body of appellate precedent on the subject, looking to the day when most district court findings of fact and arithmetical computations in sentence guideline cases can be double checked without the full blown court of appeals briefing, oral argument, and opinion writing that should be reserved for jurisprudentially weightier matters.

## II.

Appellant William M. Carroll attempted to escape from a federal correctional institute, pleaded guilty to doing so, was convicted and sentenced, and now appeals the district court's interpretation of the sentencing guidelines and the measure of proof by which the court required the government to prove the facts relied upon to compute the correct sentencing guidelines range.

Appellant argues that the district court erred in the following matters:

—Not requiring the government to prove by clear and convincing evidence the facts upon which it urged the district court to rely in determining the correct sentencing guidelines' values.

—Increasing appellant's base offense level by two levels for being an "organizer or leader."

—Increasing appellant's criminal history score by two points for committing an offense while under a criminal justice sentence.

—Increasing appellant's criminal history by two points for committing an offense within two years after release from custody.

—Denying appellant a two level reduction for acceptance of responsibility.

We agree with appellant that, as a matter of law, his base offense level could not be increased by two points on the theory that he was an organizer or leader under the "role in the offense" guideline. The remaining assignments of error are without merit, but because of the "role in the offense" miscalculation, the sentence is vacated and the matter is remanded to the district court for resentencing.

## III.

Carroll was serving a fifteen-year sentence for manufacturing counterfeit currency when, in February 1988, he asked another inmate whether the inmate knew anyone on the outside who could help Carroll escape from the Federal Correctional Institute in Milan, Michigan. The inmate promptly alerted prison authorities who instructed the inmate to put Carroll in touch with an undercover FBI agent outside the prison who would pose as a helicopter pilot for hire.

Carroll telephoned the agent six times. He also wrote several letters in which he detailed his escape plans in "invisible ink" (lemon juice). Carroll planned to pay the agent and his helpers with $1,000,000 in counterfeit currency that he would then launder by purchasing cocaine from "a couple of Venezuelan brothers." Carroll of-

fered the agent an extra $250,000 if he could recruit one more assistant and indicated a willingness to pay an additional one million counterfeit dollars for the life of the "bastard who got me this 15 years." In a later letter to the agent, Carroll identified that person, but told the agent to wait about six months so that the two could review details and defuse suspicion.

Carroll admitted that at the time scheduled for the escape, he was waiting for the helicopter in the designated place, was wearing predetermined clothing, and was signaling the pilot where to land.

Carroll was charged in a complaint with attempted escape, 18 U.S.C. § 751, and solicitation to commit murder, 18 U.S.C. § 13, relying, pursuant to the Assimilative Crimes Act, on Mich.Comp.Laws § 750.157b (1989). He pleaded guilty and was scheduled for sentencing on December 14, 1988. As required by local court rule, appellant filed written objections to the calculation of his sentencing guidelines and renewed those objections orally at the time of his sentence. He makes the same arguments on appeal that he made below.

At sentencing, Carroll did not dispute the initial determination that Guideline § 2P1.1(a) assigns a base level of thirteen to his offense; nor did he seriously dispute the court's finding that he initiated and planned the escape attempt. Rather, Carroll objected to the government's argument that he deserved a two point base level increase, pursuant to § 3B1.1(c), due to his "aggravating role" in the escape attempt. Carroll maintained that because he was the only criminally responsible person alleged to have been involved in the offense, he could not rationally be treated as an "organizer or manager" within the language and intent of the applicable guideline—regardless of whether he planned the escape—because the escape involved no other "participants" as defined in the guidelines. Carroll asserted that in this case he only organized himself and the guideline does not permit enhancement in such a situation.

Carroll also objected to the government's request to add two points to his criminal history score for having committed an offense while under a criminal justice sentence, and one point for commission of an offense within two years after release from custody. He argued that because a defendant cannot commit the offense of escape unless he is under a criminal justice sentence, the two point addition to the criminal history score mandated by § 4A1.1(d) is inappropriate in escape cases. Carroll further argued that the commission of his offense prior to his release from custody renders § 4A1.1(e) inapplicable.

Finally, Carroll argued that he was entitled to the two level "acceptance of responsibility" reduction.

The sentencing court accepted the government's position on every guideline issue. The court began the sentencing computation by applying a base offense level of thirteen. U.S.S.G. § 2P1.1(a)(1). In apparent reliance on the agent's affidavit that Carroll initiated the attempted escape, the district court increased the base by two levels due to Carroll's aggravating role in the offense, pursuant to § 3B.1.(c), for a total offense level of fifteen. The court determined Carroll's criminal history category to be Five, based on twelve criminal history points, and gave Carroll no credit, pursuant to § 3E1.1, for "acceptance of responsibility." As a result of the various enhancements, the guidelines indicated that Carroll's sentence should range from thirty-seven to forty-six months. The court imposed a sentence of forty months to run consecutive to Carroll's previous counterfeiting sentence, followed by three years' supervised release.

IV.

A.

■ Appellate review of sentences imposed under the guidelines is set forth at 18 U.S.C. § 3742 (1989), which provides in pertinent part:

(e) **Consideration.**—Upon review of the record, the court of appeals shall determine whether the sentence—

(1) was imposed in violation of law;

(2) was imposed as a result of an incorrect application of the sentencing guidelines;

. . . .

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

**(f) Decision and disposition.**—If the court of appeals determines that the sentence—

(1) was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate. . . .

Under the "due deference" standard of 18 U.S.C. § 3742(e), the appellate review standard varies depending on whether an issue is factual, legal, or mixed. *United States v. Ortiz*, 878 F.2d 125 (3d Cir.1989).

### B.

■ Carroll first claims that the district court erred in not requiring the government to prove by clear and convincing evidence those facts upon which the court should rely in determining the sentence pursuant to the guidelines.[1] We disagree.

As the Fourth Circuit recently noted in *United States v. Urrego–Linares*, 879 F.2d 1234 (4th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989), other courts examining the standard of proof required by the guidelines "have generally agreed that a preponderance standard is the proper measure." *See, e.g., United States v. Lovell*, 715 F.Supp. 854 (W.D. Tenn.1989); *United States v. Dolan*, 701 F.Supp. 138, 140 (E.D.Tenn.1988); *United*

*States v. Silverman*, 692 F.Supp. 788, 791 (S.D.Ohio 1988). Moreover, although *McMillan v. Pennsylvania*, 477 U.S. 79, 91, 106 S.Ct. 2411, 2418, 91 L.Ed.2d 67 (1986), was a pre-guidelines case, *McMillan's* due process analysis applies with equal force to federal courts. *See United States v. Lee*, 818 F.2d 1052, 1057 (2d Cir.), *cert. denied*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987); *United States v. Fernandez–Vidana*, 857 F.2d 673, 675 (9th Cir.1988). In *McMillan*, the Supreme Court rejected a contention that a sentencing court must apply a clear and convincing standard to factual findings relevant to sentencing determinations. The *McMillan* Court concluded that Pennsylvania's statutory requirement of proof by a preponderance satisfied due process, noting that "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all." 477 U.S. at 91, 106 S.Ct. at 2419.

While the precise question whether the Constitution mandates proof of facts by at least a preponderance standard was not before the *McMillan* Court and is not before us, we certainly think the trial court's application of that standard here suffices. We discern no reason to accept appellant's claim that the advent of a new sentencing system requires application of a standard higher than that accepted in *McMillan*.

### C.

We turn next to Carroll's claim that the trial court erred by adding two points to the base level for his offense pursuant to § 3B1.1(c). Carroll argues that guideline § 3B1.1 applies to organizers or leaders involved in "organizational crime" and that enhancement was improper in this case because he was the sole defendant alleged to have participated in this offense.

---

**1.** Both parties agree that the burden of persuading the court that an aggravating factor applies remains with the government. The parties do not address, so neither do we, whether the government should also be required to disprove application of mitigating factors or whether the burden of persuading the court that a point

reduction applies should shift to the defendant seeking the reduction. *See United States v. Lovell*, 715 F.Supp. 854 (W.D.Tenn.1989) (shifting burden of persuasion); *United States v. Dolan*, 701 F.Supp. 138, 140 (E.D.Tenn.1988) (burden remains on government at all times).

It is necessary for an adequate understanding of Carroll's argument and a resolution of the issue to burden our opinion by setting forth, in full, the relevant guidelines and related commentary:

## PART B—ROLE IN THE OFFENSE

### Introductory Commentary

*The Part provides adjustments to the offense level based upon the role the defendant played in committing the offense. When an offense is committed by more than one participant, § 3B.1 or 3B.2 (or neither) may apply. Section 3B1.3 may apply to offenses committed by any number of participants.*

### § 3B1.1 *Aggravating Role*

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

### Commentary

*Application Notes:*

1. *A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted.*

. . . .

3. *. . . This adjustment does not apply to a defendant who merely suggests committing the offense.*

. . . .

§ 3B1.4 In any other case, no adjustment is made for role in the offense.

### Commentary

*Many offenses are committed by a single individual or by individuals of roughly equal culpability so that none of them will receive an adjustment under this Part.*

The introductory commentary to the "Role in the Offense" enhancement provision states that § 3B1.1 may apply "when an offense is committed by more than one participant." The commentary to the same section defines "participant" as any "person who is criminally responsible for commission of the offense" with which the defendant has been charged. Because Carroll only "organized" law enforcement authorities—persons who could not have been "criminally responsible"—it is undisputed that Carroll's crime involved only one offender and, therefore, no criminal organization or enterprise.

The government maintains that enhancement was appropriate because the commentary referring to, and apparently requiring, "participants" is merely equivalent to legislative history that should be ignored when the plain language of the guideline is clear. *See* § 1B1.7, Comment.; *McBarron v. S & T Industries, Inc.*, 771 F.2d 94, 97 (6th Cir.1985). The government argues that although

> the word "participants" is explicitly used in the two previous subsections, . . . in the subsection in question, the term "any criminal activity other than described [in the two previous sections]" is substituted. Thus, no magic number of "participants" need be proven, by the plain language of the guideline. The Introductory Commentary does not state that the Aggravating Role adjustments (§ 3B1.1) apply *only* to offenses committed by more than one participant. It merely provides a general rule—an overview or "Introduction" to the entire chapter; it is not tailored to the specific and peculiar situation presented in this case where the defendant unwittingly attempts to organize the non-culpable.

In further support of its reading of the guideline, the government asserts the following:

The purposes behind an "organizer or leader" adjustment include punishing more severely those who are more likely to profit and those who, by virtue of their willingness to lead, "present a greater danger to the public and/or are more likely to recidivate." § 3B1.1, Commentary (Background). These purposes are just as applicable when the defendant unwittingly tries to organize and lead non-criminals. In short, this defendant should be subject to the same sentencing range as a defendant who, by luck, picks a fellow inmate who *is* willing to break the law and who hires a *real* pilot on the outside who will jump at the chance to make two million dollars in counterfeit currency that can be laundered through drug deals.

■ Our review of this guidelines construction issue is plenary. *United States v. Ofchinick*, 877 F.2d 251, 256 (3d Cir. 1989); 18 U.S.C. § 3742(f)(1).

We disagree with both the government's reading of the guideline and its characterization of Carroll as a leader. With respect to the government's argument that the "participants" requirement should be treated as superfluous legislative history creating an ambiguity in an otherwise clear statute, we note that, unlike traditional legislative history which is often written by legislative staff and not subject to congressional vote, the commentary here accompanies and is printed between the various guideline provisions in the Guidelines Manual, an official publication of the United States Sentencing Commission. Furthermore, the government's authority for treating commentary as legislative history is actually found in the commentary to another guideline whose language indicates that the commentary has greater significance than the government recognizes. That introductory guideline and its commentary states:

§ **1B1.7** *Significance of Commentary*
The Commentary that accompanies the guideline sections may serve a number of purposes. First, it may interpret the guideline or explain how it is to be applied. Failure to follow such commentary could constitute an incorrect applica-

tion of the guidelines, subjecting the sentence to possible reversal on appeal. *See* 18 U.S.C. § 3742.

. . . .

*Commentary*

*Portions of this document not labeled as guidelines or commentary also express the policy of the Commission or provide guidance as to the interpretation and application of the guidelines. These are to be construed as commentary and thus have the force of policy statements.*

*In stating that failure to follow certain commentary "could constitute an incorrect application of the guidelines," the Commission simply means that in seeking to understand the meaning of the guidelines courts likely will look to the commentary for guidance as an indication of the intent of those who wrote them. In such instances, the courts will treat the commentary much like legislative history or other legal material that helps determine the intent of the drafter.*

It is disingenuous for the government to cite the commentary as support for its argument that we should ignore the commentary.

While we recognize and accept the government's argument that one of the purposes of this enhancement section is to punish more severely those who, like Carroll, are "willing to lead," the background to § 3B1.1, from which the government also selectively quotes, indicates that leadership of culpable individuals is necessary. The background explains that "[t]his section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (*i.e.*, the number of participants in the offense) *and* the degree to which the defendant was responsible for committing the offense." U.S.S.G. § 3B1.1, Comment, (backg'd.) (emphasis added). The government ignores the underscored conjunction and, therefore, the first half of the sentence. The government also fails to address those portions of

the commentary to § 3B1.1 indicating the following:

> This adjustment does not apply to a defendant who merely suggests committing the offense.
>
> . . . .
>
> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).

■ While Carroll may have suggested a prison escape, the government, unbeknownst to Carroll, had actually taken over and was actually organizing the operation.[2] Just as the government cannot claim that a defendant conspired with a government agent because "proof of an agreement between a defendant and a government agent or informer will not support a conspiracy," *United States v. Pennell,* 737 F.2d 521, 536 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985), the government cannot claim that Carroll was leading or organizing government agents. When read in context, the language of the guideline indicates that its drafters did not seek to provide "supervisory" enhancement in a case such as this. Rather, like conspiracy, this guideline requires that a defendant engage in criminal activity with at least one other criminally culpable person. To accept the government's argument that § 3B1.1(c) should be read exclusive of the commentary would permit enhancement where a single offender engaged in what could be considered an "otherwise extensive" criminal activity by the mere fact that the activity involved use of the services of several innocent people. We hold that enhancement pursuant to § 3B1.1 requires the participation of at least two culpable individuals so that leadership of some criminal enterprise or organization, however minimal, can be claimed.

### D.

■ Appellant next challenges the increase of his criminal history score by two points for the "commission of the instant offense while under any criminal justice sentence," § 4A1.1(d), and by one point for the "commission of the instant offense less than two years after the release from imprisonment," § 4A1.1.(e). Those sections provide in pertinent part:

CHAPTER FOUR—CRIMINAL HISTORY AND CRIMINAL LIVELIHOOD
PART A—CRIMINAL HISTORY

. . . .

### § 4A1.1 *Criminal History Category*

The total points from items (a) through (e) determine the criminal history category in the Sentencing Table in Chapter Five, Part A.

(a) Add 3 points for each prior sentence of imprisonment exceeding one year and one month.

(b) Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a).

(c) Add 1 point for each prior sentence not included in (a) or (b), up to a total of 4 points for this item.

(d) Add 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status.

(e) Add 2 points if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under (a) or (b). If 2 points are added for item (d), add only 1 point for this item.

Carroll maintains that because he was charged with escape, the base offense level

---

**2.** The government might have arrested Carroll after he had spoken only to the informant. Obviously the government's evidence would not have been nearly as compelling, but the crime would have been the same. Instead, the government organized and orchestrated its own scheme, introducing Carroll to an agent who was able to obtain the incriminating evidence that led to Carroll's guilty plea by appearing to participate in the planned escape.

implicitly included punishment for an offense committed while under sentence since, by definition, one cannot escape unless one is under a criminal justice sentence. Carroll argues that the additional two point increase is a double punishment.

In calculating Carroll's criminal history points, the probation department report relied on the language of the enhancing guideline and on the answer to Question 22 of the Sentencing Commission's "Questions Most Frequently Asked About The Sentencing Guidelines," issued on May 5, 1988. In that publication, the Commission stated that in drafting the guidelines the Commission intended that courts would impose two criminal history points for § 4A1.1(d) and one point for § 4A1.1(e) when sentencing escape offenders.[3] The trial court adopted the probation department's calculation of the criminal history score, noting reliance on the Sentencing Commission's commentary.

In agreement with the Third and Tenth Circuits, we note that the language of Guideline § 4A1.1 does not support a different result. *See United States v. Ofchinick,* 877 F.2d 251 (3d Cir.1989) (defendant convicted of escape from custody may receive criminal history enhancement under Guideline §§ 4A1.1(d) and (e) for escaping while under a sentence of imprisonment and while still in confinement, even though being in custody is an element of the offense); *United States v. Goldbaum,* 879 F.2d 811 (10th Cir.1989) (affirming use of Guideline § 4A1.1(d) to add two points to criminal history score of defendant convicted of escape). *But see United States v. Clark,* 711 F.Supp. 736 (S.D.N.Y.1989) (such use constitutes double counting); *United States v. Bell,* 716 F.Supp. 1207 (Minn.1989) (same holding).

The language of § 4A1.1(d) indicates that that provision applies to all offenses committed while imprisoned. The commentary to the guidelines often cautions against double counting in particular areas, but fails to indicate that adding three points here would violate that principle. Because the language of the guidelines fails to support his argument, Carroll claims that it was never the Commission's intent to enhance the base offense level for escape. But as the sentencing court recognized, the Sentencing Commission's answer to this specific question disproves Carroll's argument that the Commission intended, through the assignment of a base level of thirteen, to account for the fact that the offense was committed while under a sentence. Moreover, "[t]he structure of the Sentencing Guidelines suggests that the criminal history category is to be determined without regard to the nature of the crime for which the defendant is currently being sentenced." *Goldbaum,* 879 F.2d at 813, *citing United States v. Reyes–Ruiz,* 868 F.2d 698, 700 (5th Cir.1989).

The better inference is that the Commission chose not to propose an even higher base level for escape offenses because it anticipated that a separate upward adjustment in the criminal history category would produce a similar result. The *Goldbaum* court stated:

> [I]n the absence of any contrary intent we must apply the clear language of the guideline and presume that in formulating the base level specified for the crime of escape in Guideline § 2P1.1, the Sentencing Commission had in mind that under Guidelines §§ 4A1.1(d) and (e), points would be added to the particular defendant's criminal history category thereby enhancing the sentence.

Carroll also maintains that the court made an interpretation error by adding one

---

**3.** Question 22 provides in pertinent part:

22. In a case involving escape from prison (or work release) as the instant offense, does the defendant receive two criminal history points for § 4A1.1(d) and one more for § 4A1.1(e)?

Yes, providing the prior sentence of imprisonment (or work release from confinement) is at least 60 days. The defendant receives two

*points pursuant to § 4A1.1(d) for committing the instant offense while under any criminal justice sentence. Another point is received for committing the offense less than two years after release from imprisonment on a sentence of at least 60 days (§ 4A1.1(e)). As stated in Application Note # 5, § 4A1.1(e) "also applies if the defendant committed the instant offense while still in confinement on such a sentence."*

point under guideline § 4A1.1(e), which provides that one or two points shall be added to the criminal history category "if the defendant committed the instant offense less than two years after release from imprisonment." Carroll argues that this guideline is inapplicable to his situation because he was obviously not released before he committed the offense.

This claim was recently rejected by the Fourth and Tenth Circuits. *See United States v. Ofchinick,* 877 F.2d 251, 256–57 (3d Cir.1989); *United States v. Goldbaum,* 879 F.2d 811 (10th Cir.1989). The *Ofchinick* court indicated:

> Unquestionably the language of the guideline supports [appellant's] interpretation. However, application note 5 to guideline § 4A1.1 indicates that guideline § 4A1.1.(e) "applies if the defendant committed the instant offense while still in confinement on such a sentence." Guideline § 1B1.7 provides that the commentary, which includes the application notes, may be used to "interpret the guideline or explain how it is to be applied." Thus, there is no question but that the computation of [appellant]'s criminal history category was consistent with the intent of the Sentencing Commission.
>
> Thus, while we recognize the inconsistency between the guideline and the note, we do not see how we cannot follow the note, as the Sentencing Commission issued both the guidelines and the commentary in its official Guidelines Manual. This is not the usual case in which we are asked to accept legislative history such as committee reports, or even testimony of a witness before a committee, to determine the intent of Congress as a whole.

(Footnote omitted.)

Like the Fourth Circuit, we recognize that the commentary accompanying the Sentencing Guidelines Manual is unusually probative of the Commission's intent on this issue. We also recognize that a recent amendment to this section, which took effect on November 1, 1989, supports our interpretation by adding "or while in im-prisonment or escape status on such a sentence" to the end of the first sentence of the guideline. "Inasmuch as the amendment to the guideline is intended to clarify the existing guideline, we may give it substantial weight in determining the meaning of the existing guideline." *Ofchinick,* 877 F.2d at 257 n. 9. We affirm the sentencing court's application of the guidelines to determine Carroll's criminal history category.

### E.

Finally, Carroll contests the district court's refusal to grant him a two level offense reduction for his "acceptance of responsibility" as permitted by § 3E1.1 of the guidelines. Carroll maintains that he should have received the two level reduction because he waived indictment and pleaded guilty within two weeks of his initial appearance on the complaint. The district court disagreed, concluding that Carroll had not "expressed any remorse" and was only "trying to be [as] persuasive as possible ... to pay the minimum to what he did to himself."

This circuit recently discussed the standard for reviewing a district court's "acceptance of responsibility" determination in *United States v. Wilson,* 878 F.2d 921 (6th Cir.1989). Quoting *United States v. Thomas,* 870 F.2d 174, 176 (5th Cir.1989), we explained:

> Whether or not a defendant has accepted responsibility for his crime is a factual question. The district court's determination of that question, like its findings with respect to manager status, and minimal participant status, enjoys the protection of the "clearly erroneous" standard. Because the trial court's assessment of a defendant's contrition will depend heavily on credibility assessments, the "clearly erroneous" standard will nearly always sustain the judgment of the district court in this area. Indeed, the guidelines specifically state that "[t]he sentencing judge is in a unique position to evaluate the defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not

be disturbed unless it is without foundation."

(Citations omitted.)

 A guilty plea does not automatically entitle a defendant to the acceptance of responsibility reduction. *See* § 3E1.1.(c). Although a guilty plea may provide some evidence of a defendant's acceptance of responsibility, that acceptance remains questionable where, as here, the plea may have been induced by factors of overwhelming evidence of guilt and desire to avoid the risk of conviction on other charges, such as solicitation to murder. Carroll's continued insistence that the inmate-informant had initially approached him further supports the court's conclusion that Carroll had not accepted full responsibility for the offense.

Finally, the factors that § 3E1.1's commentary lists as appropriate to consider in deciding whether to apply the "acceptance of responsibility" reduction hardly apply to Carroll. Carroll did not voluntarily withdraw from or terminate his criminal conduct prior to his apprehension or in some other way timely manifest through his conduct an acceptance of responsibility. Carroll merely entered a guilty plea in the face of almost certain conviction. The district court was in a much better position to observe Carroll's demeanor, and whether we agree with its ruling is not the issue. The real question is whether the district court's finding of fact in the matter is clearly erroneous. Plainly, it is not.

## V.

For the reasons given, appellant's sentence is VACATED and the matter is REMANDED for resentencing.