**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Phillip S. DAVIS, Defendant–Appellant.**

**No. 89–6519.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 16, 1990.

Decided Nov. 30, 1990.

John W. Gill, Jr., U.S. Atty., Curtis L. Collier, Steven H. Cook, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Chattanooga, Tenn., for plaintiff-appellee.

Bobby Lee Cook, Cook & Palmour, Summerville, Ga., Jake Arbes (argued), Atlanta, Ga., for defendant-appellant.

Before NATHANIEL R. JONES and NELSON, Circuit Judges, and SILER, Chief District Judge.*

DAVID A. NELSON, Circuit Judge.

This is a drug conspiracy case in which the defendant is appealing a 14–year sentence of imprisonment. The district court (Edgar, J.) set the sentence at the low end of the sentencing guideline range, as computed by the court. The defendant contends, among other things, that the range was miscalculated because, in determining the quantity of drugs involved in the conspiracy, the court relied on an out-of-court statement made by the defendant at a time when his mental condition was suspect. The defendant also contends that use of

* The Honorable Eugene E. Siler, Jr., Chief Judge, United States District Court for the Eastern District of Kentucky, sitting by designation.

the statement (which was elicited by a probation officer in an interview that the defendant's lawyer chose not to attend) violated the defendant's Fifth Amendment right against compelled self-incrimination.

We conclude that no violation of the Fifth Amendment occurred, the defendant not having been compelled to be a witness against himself. We conclude further that the district court's factual determination as to the quantity of drugs involved was not clearly erroneous. Accordingly, and because we find none of the defendant's other contentions persuasive, we shall uphold the sentence.

## I

The defendant, Phillip S. Davis, is a man of superior intelligence. He also suffers from a long-standing mental disorder. One of his former psychiatrists testified, at sentencing, that Mr. Davis has "a chronic severe anxiety/phobic neurosis," superimposed on "a cyclothymic personality disorder." His current psychiatrist described the condition as a "panic disorder." Mr. Davis (who was 45 years old at the time of his sentencing) told Judge Edgar that he had been taking medication for many years, and was currently "well-regulated on a medication called Klonopin, which is a blocker for panic disorder."

In the early 1980s, according to Mr. Davis' presentence report, he began buying and selling marijuana. He switched to cocaine in 1983, and continued trafficking in that substance until his arrest on March 16, 1989. He had begun to withdraw from the cocaine business, and at the time of his arrest had only one big customer left, a man named Donald Howard.

Mr. Davis was carrying a loaded pistol when arrested, and another loaded pistol was found in the glove compartment of his late-model Mercedes. On the morning of his arrest he was observed hiding two bags of cocaine on the grounds of a community center at which an elementary school was located. Subsequent to his arrest the police found more cocaine in a safe at his girlfriend's house. Also recovered there were scales and plastic bags containing co-caine residue. It appears that Mr. Davis utilized a telepager to facilitate communications with his customers. There is no question that he was functioning as a professional drug dealer, jeopardizing others (including children) in the process.

A federal grand jury handed up a 15–count indictment against Mr. Davis. He pleaded not guilty and was freed on a $500,000 bond. His counsel subsequently negotiated a plea bargain, and Mr. Davis was rearraigned on June 14, 1989. At that time he pleaded guilty to a single count charging him with unlawful distribution of two ounces of cocaine on March 9, 1989, one week before his arrest. The indictment's remaining counts, including one charging him with possession of three and one-half ounces of cocaine on the day of the arrest, were dismissed. Pursuant to the plea bargain, however, Mr. Davis pleaded guilty to an information charging that over a period beginning in March of 1987 and continuing to March 16, 1989, he conspired with others to distribute cocaine. After approval was obtained from the Department of Justice, Mr. Davis also pleaded guilty to an information charging him with income tax violations.

In the course of his rearraignment on June 14, 1989, Mr. Davis responded, under oath, to a battery of questions posed by the district judge. One of the topics covered was whether Mr. Davis was in a condition to make decisions that day. Mr. Davis assured the judge that he was: "I'm alert and sober and not overly medicated." One of his two lawyers backed him up on this, and the court found as a fact that the defendant was not under the apparent influence of narcotics or other drugs and was competent to plead.

Before accepting the plea, the judge asked the government to describe the case it was prepared to present against Mr. Davis. The prosecutor responded that beginning in March of 1987, and continuing to the date of the arrest, defendant Davis supplied "a cooperating individual" (Donald Howard, presumably) with at least two ounces of cocaine every two weeks. When asked if this were true, Mr. Davis respond-

ed thus: "Basically, I would say that is true."

Immediately after his rearraignment, Mr. Davis—who remained free on bond—was asked by a probation officer, Ms. Leslie Cory, to participate in a presentence interview. Ms. Cory did not order him to participate, and neither did the court; there has been no showing that the interview was anything other than voluntary.

It had been established at the rearraignment that Mr. Davis had already discussed the sentencing guidelines with one of his attorneys and understood that the court could not determine what guidelines were applicable until a report was received from the probation officer. Assuming, perhaps, that Mr. Davis' attorney had explained to him how the preparation of such a report would be handled, the judge did not touch on that subject; he did explain the Fifth Amendment privilege against self-incrimination, however, and he also told Mr. Davis that "you have a right to have counsel represent you at all stages of any criminal proceeding."

Probation Officer Cory subsequently testified that when she set up the interview with Mr. Davis, she invited one of his lawyers to attend. The lawyer, for reasons unknown to us, declined.

Ms. Cory explained the purpose of the interview to defendant Davis before getting into a discussion of the facts of the case. Although Mr. Davis appeared "distraught" at having pleaded guilty, and was "a little hyper" and "bombastic," there is no contention that Ms. Cory employed any threats or coercion. She testified without contradiction that she did not. Her presentence report noted, moreover, that Ms. Cory made it a practice "to inform the defendant that, if at any time during the interview he has a question as to why the probation officer wishes to discuss any particular matter, he should feel free to interrupt the interview to ask the probation officer to explain the reason for her question."

Ms. Cory testified that she asked Mr. Davis about the facts asserted by the government at the hearing earlier in the day, and Mr. Davis replied that "the facts were about right." The government had spoken of a minimum of two ounces of cocaine every two weeks, however, and Mr. Davis told Ms. Cory that he supplied Mr. Howard on a *weekly* basis:

"He said initially, he dealt five or six ounces of cocaine a week to Donald Howard, but then it dropped off to just a couple ounces of [sic] week towards the end."

Ms. Cory did not complete her presentence report until more than a month after the interview. On July 18, 1989, while working on the report, she realized she did not know precisely when it was that the quantity of cocaine Mr. Davis was supplying to Mr. Howard dropped off to two ounces a week. Accordingly, she called Mr. Davis on the telephone and asked him.

Mr. Davis responded that he had never sold Mr. Howard two to five ounces a week. Howard sometimes went two or three weeks, or even a month, without making a purchase, Mr. Davis now said, adding that there was only one occasion when Howard bought as much as four ounces. Ms. Cory asked Mr. Davis why he had given a different account at the interview on June 14, and he replied that it "had been a long day."

Ms. Cory presented both versions of the story in her presentence report, but indicated that she found the earlier statement more credible. In calculating the quantity of drugs involved, as required by U.S.S.G. §§ 2D1.1 and 2D1.4, she decided to reject the July 18 version and use the minimum amount—two ounces per week—specified by Mr. Davis at the June 14 interview.

With certain adjustments called for by the guidelines, this produced a total offense level of 34. If Ms. Cory had based her calculations on the quantity the government said it could prove independently, the total offense level would have been only 30. Assuming Mr. Davis belonged in Criminal History Category III, as the probation officer believed he did, an offense level of 34 would have yielded a guideline range of 188–235 months' imprisonment. An of-

fense level of 30, on the other hand, would have yielded a guideline range of 121–151 months. Absent a departure from the guideline range, use of the June 14 statement would thus increase the sentence by more than three years.

Through his counsel, Mr. Davis filed written objections to the presentence report. He challenged the quantity of drugs involved, asserting that "Mr. Davis sold to Mr. Howard *sporadically* over a two year period in approximately two ounce quantities," and he objected "to the use by the probation officer of any statements Mr. Davis might have made to the probation officer ... without first having been given Miranda warnings." (Emphasis supplied.)

On the strength of the June 14 statement, the district court decided to accept the two-ounce-per-week figure. In a written memorandum supplementing extensive findings and conclusions announced from the bench, the court found that "the presentence report accurately concludes that the defendant supplied Mr. Don Howard with at least 208 ounces of cocaine in the two-year period between March 1987 and March 1989...." Even though Mr. Davis subsequently recanted his June 14 statement, the court explained orally, "what he said originally was, more likely, the most accurate depiction of his conduct here...." The court concluded that the government had carried its burden of proof by a preponderance of the evidence.

As to the *Miranda* issue, the court declared that "*Miranda* does not apply to a routine presentence interview." Among the considerations mentioned by the court in declining to hold otherwise here were the following:

"The defendant had already in effect been 'Mirandized' at his initial appearance before the United States Magistrate in CR–1–89–23. He had also been advised of all of his relevant constitutional rights by the Court when the defendant's plea was taken. At the time of the probation interview, the defendant was free on bond. The defendant's attorney declined the probation officer's invitation to attend the interview."

The court went on to stress that there had been no hint of coercion, and that the information obtained by the probation officer related to crimes to which the defendant had just pleaded guilty, not other crimes.

The district court did not agree with the probation officer that the defendant's record placed him in Criminal History Category III. Accepting a defense argument that Category II was applicable, and using an offense level of 34, the court determined that the guideline range was 168–210 months. The court imposed the lowest possible sentence within that range—imprisonment for 168 months. This appeal followed.

## II

In asking us to reverse the district court's finding on the reliability of the June 14 statement, counsel urges that because of the defendant's psychiatric problems, the statement should not have been considered. Defendant Davis had testified earlier in the day that his problems were "well-regulated" by medication, however, and we cannot say that the determination made by Judge Edgar—who had engaged in a lengthy colloquy with the defendant just before the latter's interview with the probation officer—was clearly erroneous. That is the test we must apply. *United States v. Robinson*, 898 F.2d 1111, 1116 (6th Cir.1990).

Counsel speculates that Mr. Davis "probably believed the more he confessed to, the more he was accepting responsibility." But there has been no showing that the lawyer who explained the guidelines to Mr. Davis encouraged him to exaggerate his offenses in the hope of getting a lighter sentence; the more natural assumption would be that the lawyer advised Mr. Davis to tell the truth.

If the lawyer had entertained even the slightest suspicion that Mr. Davis would not be able to give reliable answers to the probation officer's questions, it is not likely that the lawyer would have chosen to absent himself from the interview. We are troubled, nonetheless, by the law-

yer's decision not to attend. If this had been a civil case, one wonders whether the lawyer would have let his client be deposed without counsel being present. Be that as it may, we are not persuaded that the questionable performance by the attorney makes the client's statement unusable as a matter of law. Because Judge Edgar found the statement reliable, and because that finding is not clearly erroneous, the statement was usable unless it had to be excluded on self-incrimination grounds. We turn to that issue next.

### III

The self-incrimination question has two aspects: whether the defendant's statement was obtained in violation of his rights under the Fifth Amendment, and whether it was obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is well settled that *Miranda* sweeps more broadly than the Constitution does, and rights to the "prophylactic" warnings prescribed in certain circumstances by *Miranda* "are 'not themselves rights protected by the Constitution....'" *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985) (quoting *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974)).

■ The issue under the Fifth Amendment is whether Mr. Davis was, in the words of the amendment, "compelled ... to be a witness against himself...." Was the incriminating statement "compelled," or was it voluntary?

If the statement was compelled, it would have been inadmissible at trial (see *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409 (1984)), and might well have been unusable in sentencing proceedings also. See *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), holding that

prior convictions obtained in violation of the Constitution may not be used to enhance a defendant's punishment. The mere fact that the statement was incriminating, however, does not mean that it was compelled. *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376 (1943). The Fifth Amendment is "not self-executing," *Roberts v. United States*, 445 U.S. 552, 559, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980), and the privilege against self-incrimination may not be relied on, generally speaking, "unless it is invoked...." *Id.*

As a factual matter, it is abundantly clear that Mr. Davis gave his statement to the probation officer voluntarily and not under compulsion. Davis was in the presence of his lawyer when the probation officer requested the interview, and the lawyer, as we have seen, made no move to stop the interview or even to attend it. The probation officer testified that about 15 to 20 percent of the defendants she interviews decline to discuss the facts of their offenses; Mr. Davis was obviously not in that number. His problem, it turns out, was that he was all too eager to talk. Nothing in the Constitution prevented him from doing so. Even if Mr. Davis overstated the quantities of drugs involved because he had a subjective belief that this would demonstrate acceptance of responsibility, thereby entitling him to a two-point reduction in his offense level under U.S. S.G. § 3E1.1, such a circumstance would not have rendered the statement involuntary. *United States v. Rogers*, 899 F.2d 917 (10th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990).

As to whether Judge Edgar was required to administer a prophylactic warning of the *Miranda* type in connection with the presentence interview, our recent decision in *United States v. Miller*, 910 F.2d 1321 (6th Cir.1990), establishes that no such warning was required.[1] *Miller*, in fact, is a much

---

**1.** At least three other circuits appear to agree that *Miranda* warnings are not required prior to routine presentence interviews by a probation officer. *Baumann v. United States,* 692 F.2d 565, 576 (9th Cir.1982); *United States v. Jackson,* 886 F.2d 838, 842 n. 4 (7th Cir.1989); *United*

*States v. Rogers,* 899 F.2d 917, 921–24 (10th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990). See also *Roberts v. United States,* 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980) (*Miranda*'s requirement of specific warnings "does not apply outside the

stronger case than this one. The defendant in *Miller* had waived his right to counsel on the date of his arrest, and had acted *pro se* in working out a plea bargain and entering a plea of guilty. The trial judge had affirmatively commanded Mr. Miller to be honest and candid with the probation officer—"to bare his soul," as Chief Judge Merritt put it. 910 F.2d at 1332 (Merritt, C.J., dissenting). Citing the pre-guideline case of *Baumann v. United States*, 692 F.2d 565 (9th Cir.1982), a majority of the *Miller* panel concluded that no *Miranda*-type warnings were required. It follows *a fortiori* that no such warnings were required in the case at bar, where the defendant (who was free on bond at the time of his interview) was represented by two lawyers and was never told by the court that he had to bare his soul to the probation officer. Even without *Miller*, we would have had no inclination to create an irrebuttable presumption of "coercion" in a situation such as this, where it is perfectly clear that coercion simply was not used.

*Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), is not in point here. That was a capital case in which the defendant, while in custody, was subjected to a court-ordered psychiatric examination that took place without prior notice to the defendant's lawyer and without advice to the defendant that he had a right to remain silent. The testimony of the psychiatrist was subsequently used to convince a jury that the defendant should be sentenced to death, and the Supreme Court held that this violated the defendant's rights under the Fifth and Sixth Amendments. The case at bar obviously presents a far different picture; here the defendant was not facing a possible death penalty, he was not in custody at the time of the interview, he had recently been advised of his privilege against self-incrimination, no one ordered him to submit to the interview, and his

lawyer had been given notice of the interview and an invitation to attend.

## IV

The remaining issues raised by defendant Davis need not detain us long.

■ The district court could have chosen to impose a sentence below the guideline range pursuant to U.S.S.G. § 5K2.13 (downward departure may be warranted where defendant committed non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants), but the district court rejected that choice. Where, as here, the guideline range was properly computed, the district court was not unaware of its discretion to depart from the guideline range, and the sentence was not imposed in violation of law or as a result of an incorrect application of the guidelines, the failure to depart is not cognizable on appeal under 18 U.S.C. § 3742(a). See *United States v. Draper*, 888 F.2d 1100, 1105 (6th Cir.1989); *United States v. Sawyers*, 902 F.2d 1217, 1221 n. 5 (6th Cir.1990).

■ Mr. Davis also contends that he was entitled to a downward departure under U.S.S.G. § 5K1.1 because he made a good faith attempt to help the government get the goods on a woman who supplied him with cocaine. The government's belief that he was not being forthright in his offer of assistance, Mr. Davis contends, resulted from a failure to understand his mental condition. *Draper* and *Sawyers*, however, teach that such a contention is not cognizable on appeal. Moreover, a departure under U.S.S.G. § 5K1.1 requires a motion by the government ("upon motion of the government stating that the defendant has provided substantial assistance ... the court may depart from the guidelines"); no such motion was made in this case. "[T]he district court may consider a downward

context of the inherently coercive custodial interrogations for which it was designed.") *Cf. United States v. Rea*, 678 F.2d 382, 390 (2d Cir.1982) (prisoner released on probation not entitled to *Miranda* warnings when speaking with probation officer); *United States v. Mac-*

*Kenzie*, 601 F.2d 221, 222 (5th Cir.1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980) (*Miranda* warnings not required at interview with probation officer regarding revocation of probation).

departure pursuant to § 5K1.1 *only* 'upon [the] motion of the government.'" *United States v. Levy,* 904 F.2d 1026, 1035 (6th Cir.1990).

The district court raised the defendant's offense level by two points pursuant to U.S.S.G. § 3B1.1 because it found he was an "organizer, leader, manager, or supervisor" in the criminal activity. This finding was not clearly erroneous, in our view.

Based on considerations we rejected in *United States v. Levy,* 904 F.2d 1026, *supra,* and *United States v. Carroll,* 893 F.2d 1502 (6th Cir.1990), finally, Mr. Davis argued that the sentencing guidelines are unconstitutional. It would be inappropriate for a three-judge panel to undertake to overrule *Levy* and *Carroll;* only the full court, sitting *en banc,* could do that. The likelihood of such a development, we suspect, is negligible.

AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, dissenting.

The issue in this case is whether the proof presented in support of the amount of cocaine used to calculate the base offense level satisfied a preponderance of the evidence standard. *United States v. Walton,* 908 F.2d 1289, 1302 (6th Cir.1990). The district court's determination is a finding of fact which must be accepted unless it is found to be clearly erroneous. *Id.* at 1300-01. I believe that the district court incorrectly computed the base offense level by relying on unreliable information. I would vacate the sentence and remand so that the base offense level could be redetermined. As a result, I respectfully dissent.

In *United States v. Walton,* 908 F.2d at 1303, this court reversed and remanded for resentencing after determining that the district court incorrectly calculated the amount of cocaine involved. The district court found that defendants were accountable for 455 grams of cocaine based on (1) evidence that defendants sold 3.5 grams of cocaine per week in April 1986, (2) the fact that a large amount of cocaine processing paraphernalia was found in defendants' basement, and (3) an assumption that defendants sold cocaine for over two years at a rate of 3.5 grams per week. This court found that there was no direct or circumstantial evidence to support the district court's assumption that defendants sold quantities of cocaine for a two-year period. We stated that:

> We believe that the guidelines do not permit the District Court to hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible. If the exact amount cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate. Thus when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.

*Id.* at 1302.

This court also recently reversed a district court which improperly calculated the quantity of drugs used in determining an offense level because the estimate was based only on a "guess" by the defendant's girlfriend. *United States v. Robison,* 904 F.2d 365, 371-72 (6th Cir.1990). The girlfriend in *Robison* was a heavy drug user with a faulty memory who testified that she had "no factual basis" for estimating a quantity of drugs. *Id.* at 372. This court concluded that her "testimony was not sufficiently accurate to permit the district court to aggregate a specific quantity of cocaine in determining the base offense level." *Id.* at 371. Because the preponderance of the evidence did not establish the amount arrived at, this court declared the district court's finding to be clearly erroneous.

In the instant case, the district court credited Davis as responsible for 6,394.8 grams of cocaine, although the government initially documented only 3,336.4 grams. The higher figure is based on Davis' June

14 statement to the probation officer. In assessing the reliability of Davis' June 14 statement, I believe that Davis' ability to speak truthfully is relevant. Dr. Spalding and Dr. Cheatham both testified that because of his mental problems, Davis was prone to grandiosity and exaggeration. The probation officer admitted to "some inconsistencies" even during the June 14 interview. J. App. at 67. The district court stated that "the bulk of [information] provided by the Defendant was not truthful, was not complete, and was without reliability[.]" If Davis' veracity is to be impugned, it is not clear why his June 14 statement should be accepted as true, especially when there is no other evidence to support it.

In my judgment, Davis' June 14 statement to the probation officer does not, in view of *Walton* and *Robison*, establish by a preponderance of the evidence the amount of cocaine the district court held Davis accountable for. Davis does not contest the accuracy of the 3,446.4 gram figure, which would have set his base offense level at 28. Use of the higher figure, in my view, infringes Davis' due process rights because "[a]llowing a court to find a defendant responsible for the maximum quantity of drugs that can plausibly be found could result in defendants receiving excessive sentences based on a finding of quantity that is more likely than not excessive. Such a result would violate a defendant's due process rights." *Walton*, 908 F.2d at 1302. Because I believe that the district court did not establish the reliability of the higher figure, I respectfully dissent.