999 F.2d 541
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael Louis JOSEPH, Defendant-Appellant.
 No. 92-2101.
 United States Court of Appeals, Sixth Circuit.
 July 20, 1993.
 
 Before: MERRITT, Chief Circuit Judge; and JONES and NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant-Appellant Michael Louis Joseph appeals his sentence that was imposed following a plea of guilty to possession of an unregistered, sawed-off shotgun. He contends that the district court clearly erred by not granting him a two-level downward adjustment of his offense level under the federal sentencing guidelines for acceptance of responsibility. His contention is without merit.
 
 
 2
 * According to the Presentence Report prepared by a probation officer in this case, on March 19, 1992, authorities executed a search warrant of a storage unit in Saginaw, Michigan. An informant had led the authorities to believe that Joseph was storing explosives, detonator devices, and weapons in the unit. The unit indeed contained military C-4 explosives, an electric blasting cap, and weapons, including an unregistered, semi-automatic, sawed-off shotgun.
 
 
 3
 Joseph was arrested on March 25, 1992. That same day, while being transferred from his home to jail, Joseph admitted that he had possessed the shotgun for seven to eight years. The next day, while being booked, he asserted that he had acquired the explosives while he was in the military.
 
 
 4
 On April 8, 1992, a federal grand jury indicted Joseph for possession of an unregistered, sawed-off shotgun, in violation of 26 U.S.C. § 5861(d) (1988) (Count One), and for concealing and storing explosives, having reasonable cause to believe that such explosives were stolen, in violation of 18 U.S.C. § 842(h) (1988) (Count Two). Pursuant to a Rule 11 Plea Agreement, Joseph pled guilty to Count One of the Indictment. According to the terms of the agreement, the government was to recommend a two-level downward adjustment of Joseph's offense level under the federal sentencing guidelines for acceptance of responsibility "because the government believes that the defendant has accepted responsibility for the offense as demonstrated by his plea of guilty." J.A. at 31 (emphasis in original). The agreement also made it clear that "[t]he court may accept or reject the position of the government." Id. at 30. At Joseph's plea hearing on May 18, 1992, this was acknowledged:
 
 
 5
 THE COURT: That's if I accept the government's suggestion you be given credit for accepting responsibility.
 
 
 6
 The first thing I want you to understand is I may not do that, do you understand that?
 
 
 7
 A [Joseph:] Yes, your Honor.
 
 
 8
 THE COURT: It's optional with me, I want to make my own decision. I don't know, I'm not telling you I won't, but I do not know at this point whether I will or won't, do you understand that, sir?
 
 
 9
 A [Joseph:] Yes, your Honor, I do.
 
 
 10
 Id. at 58.
 
 
 11
 Also at the May 18, 1992, plea hearing, Joseph claimed to have had the shotgun "for, oh, about a year or so." Id. at 60. He also mentioned that he had purchased the explosives along with the shotgun in a package deal from "Mrs. Brown" or "the Brown kid" around June 1991. Id. at 60, 64.
 
 
 12
 On June 18, 1992, a probation officer prepared a Presentence Report in which it was recommended that Joseph not be given a two-level downward adjustment of his offense level for acceptance of responsibility:
 
 
 13
 55. Adjustment for Acceptance of Responsibility: Section 3E1.1, Application Note 1(c), states appropriate consideration of the defendant's voluntary and truthful admission to the authorities an involvement in the offense and related conduct must be considered. During interviews with ATF agents, MR. JOSEPH stated he had possessed a sawed off shotgun for seven or eight years. He further stated he obtained the explosives while he was in the military. During MR. JOSEPH'S plea and subsequent presentence interview, he stated he had purchased the weapons and explosives during June or July of 1991.
 
 
 14
 56. The conflicting statements would not amount to a "truthful admission to authorities".
 
 
 15
 Id. at 18. No objections were filed to the Presentence Report. On August 4, 1992, the district court issued a Memorandum Tentative Determination of Sentencing Guidelines Issues Pursuant to Local Rule 39(f). The district court indicated therein that it would accept the probation officer's recommendation relating to the acceptance of responsibility reduction. Joseph objected to these tentative determinations on August 12, 1992.
 
 
 16
 On August 26, 1992, the district court conducted a sentencing hearing, at which time the acceptance of responsibility issue was addressed:
 
 
 17
 THE COURT: The Court believes that a defendant who initially, when confronted with the fruits of a developing investigation, tells the investigators what is needed and tells them truthfully and does not throw them off the trail or give information which is designed to dissuade further investigatory efforts is properly due credit for acceptance of responsibility. Even a defendant who gives essentially accurate although perhaps not detailed or entirely complete, statements of his involvement may, under appropriate circumstances, be due credit for acceptance of responsibility.
 
 
 18
 The Court believes, however, that a defendant who--particularly in the initial stages of an investigation--gives false information to investigators with the apparent intent to protect others from an investigation or perhaps to protect himself from further aggressive inquiry, or for any other reason, that defendant seems to me has a tremendous burden to overcome in persuading the Court that an acceptance of responsibility credit is due.
 
 
 19
 In this case, the Court is not persuaded that the defendant is due that credit.
 
 
 20
 Id. at 73-74. The district court sentenced Joseph to fifty-seven months of imprisonment (which sentence was in the middle of the applicable federal sentencing guidelines range of 51-63 months), plus three years of supervised release, a $1000 fine, and a $50 special assessment fee.
 
 
 21
 Joseph timely appealed on September 2, 1992.
 
 II
 
 22
 Joseph contends that the district court erred by not granting him a two-level reduction for "clearly demonstrat[ing] a recognition and affirmative acceptance of personal responsibility for his criminal conduct." United States Sentencing Commission, Guidelines Manual [hereinafter U.S.S.G.] § 3E1.1(a) (Nov. 1991). The standard of review for a denial of an acceptance of responsibility reduction is discussed in Application Note Five to Section 3E1.1:
 
 
 23
 The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.
 
 
 24
 See United States v. Wilson, 878 F.2d 921, 923 (6th Cir.1989). Insofar as the determination of whether a defendant has accepted responsibility is a question of fact, it enjoys the protection of the clearly erroneous standard of review. See United States v. Lassiter, 929 F.2d 267, 270 (6th Cir.1991).
 
 
 25
 The defendant has the burden of proving, by a preponderance of the evidence, that s/he is entitled to the two-level downward adjustment for acceptance of responsibility. United States v. Williams, 940 F.2d 176, 181 (6th Cir.) ("the defendant bears the burden of showing by a preponderance of the evidence that he or she has accepted responsibility for the crime committed"), cert. denied, 112 S.Ct. 666 (1991); see also United States v. Rodriguez, 896 F.2d 1031, 1032 (6th Cir.1990) ("we now hold that when a defendant seeks to establish facts which would lead to a sentence reduction under the Guidelines, he shoulders the burden of proving those facts by a preponderance of the evidence").
 
 III
 
 26
 Joseph's chief argument on appeal is that the false statements he made concerning exactly when he came into possession of the explosives and shotgun were insignificant in the sense that they did not impair or impede any government investigation. Joseph maintains that the government attested to their insignificance in this regard at the sentencing hearing.[1] Since the false statements were insignificant, the argument runs, the district court clearly erred by relying on them in rejecting his request for an acceptance of responsibility reduction.
 
 
 27
 The key question to ask in evaluating Joseph's deservedness of an acceptance of responsibility reduction is not necessarily--what impact did the untruthful statements have on an investigation?--but rather--what do the untruthful statements tell us about his state of mind, his remorsefulness for the crime committed? The district court answered the latter question as follows:
 
 
 28
 The Court believes ... that a defendant who--particularly in the initial stages of an investigation--gives false information to investigators with the apparent intent to protect others from an investigation or perhaps to protect himself from further aggressive inquiry, or for any other reason, that defendant seems to me has a tremendous burden to overcome in persuading the Court that an acceptance of responsibility credit is due.
 
 
 29
 In this case, the Court is not persuaded that the defendant is due that credit.
 
 
 30
 J.A. at 74 (emphasis added). Given that "voluntary and truthful admission to authorities of involvement in the offense and related conduct" is a factor to be considered in determining whether the two-level reduction for acceptance of responsibility is warranted under the federal sentencing guidelines, U.S.S.G. § 3E1.1, comment. (n. 1(c)), we cannot say that the district court clearly erred in denying Joseph the reduction.
 
 
 31
 The only affirmative indicium of acceptance of responsibility that Joseph advances is that he pled guilty. Pleading guilty, however, is not necessarily sufficient to warrant the two-level downward adjustment of the offense level under the federal sentencing guidelines. See United States v. Carroll, 893 F.2d 1502, 1512 (6th Cir.1990) ("A guilty plea does not automatically entitle a defendant to the acceptance of responsibility reduction."); see also United States v. Guarin, 898 F.2d 1120, 1121-22 (6th Cir.1990).
 
 
 32
 Joseph, like many defendants-appellants before him, seems to believe that the acceptance of responsibility reduction is a right that may be taken away only upon a sufficient showing that he did not accept responsibility, that he obstructed justice in some way, etc. As a matter of law, however, the reduction must be earned by proving, by a preponderance of the evidence, acceptance of responsibility for the crime committed.
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 The actual statements made at the hearing, however, seem to suggest that Joseph's initial statements with respect to possession of the explosives might possibly have impaired important investigative efforts:
 THE COURT: Let me ask you this one more specific question, Mr. Hluchaniuk, are you aware of the progress of the investigation at its initial stages, focusing on what the Court believes to have been the critical moments here, where, as I understand it, the defendant had intentionally tried to throw the officers off the track by telling them it was a cold trail, that this material had been in his possession for years and saying nothing more specific about the source of it at that moment, later relenting and more fully confessing and so on, including the statements made under oath here in Court?
 What, if anything, was the effect of those statements on the course of the investigation or on the view that the investigating officers had of the defendant at that time?
 MR. HLUCHANIUK: Your Honor, the initial statements with respect to the shotgun, I think, merely confirmed the suspicions that the officers had, that the defendant had obtained a firearm at some point in the past. The source at that point presumably was not of great significance because we believed it to be cut down after the defendant acquired it, so the source of the gun in its original form which he could have bought out of a store or from somebody legally was not really a problem and was not viewed as being any matter that warranted further investigation.
 There was a fair amount of concern about the explosives. The defendant's statement that they--that he had them from the military which was consistent with our beliefs, quite frankly, in that we knew he had been in the military. The explosives, at least in the one form they were in, were marked as military explosives. They appeared to be not new. We, therefore, believed his statement that he had them from the time he was in the military was--which would be some years ago--was consistent with our notions at the time as to how these had been acquired.
 There was a concern about other explosives being out there someplace because part of the explosives were found packaged as they would have originally been packaged for use by the military with military markings and so forth. Whereas there was another, I'll characterize it as a softball size quantity, of C-4 explosives that had a piece missing from it, a piece that was--it was obvious whatever shape the round shape that this C-4 explosives had been made into was different than the shape they originally packaged it, that is, they come originally packaged in somewhat rectangular type bricks and this--somebody had taken them out of the original package and made a softball size item out of it. And from that there was a significant chunk removed.
 That was the concern, that somehow that chunk which in and of itself would have been lethal in terms of the--depending on the circumstances, of course--but would have been lethal as an explosive charge. We didn't know where that was and we were concerned about that.
 THE COURT: So the discussion then continued, aimed at finding that chunk?
 MR. HLUCHANIUK: Ultimately there was a proffer made by the defendant in the course of the plea negotiations. Quite frankly there was no answer to our inquiry as to where that chunk was. There were explanations offered as to where they had come from which was inconsistent with what he had said, but there was no answer given as to where that missing chunk was.
 That was one of the things that was of primary concern, that there was this piece of C-4 explosives out there someplace. We didn't know whether it had been detonated or whether it was someplace else, in somebody else the possession.
 J.A. at 70-73.