947 F.2d 942
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ricky DINGLE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Earl SCOTT, Defendant-Appellant.
 Nos. 90-5083, 90-5084.
 United States Court of Appeals, Fourth Circuit.
 Argued May 7, 1991.
Decided Oct. 28, 1991.
 
 Appeals from the United States District Court for the District of South Carolina, at Orangeburg. Charles E. Simons, Jr., Senior District Judge. (CR-89-183)
 Argued: William Murray Norris, Miami, Fla.; Parks Nolan Small, Federal Public Defender, Columbia, S.C., for appellant; Robert Claude Jendron, Jr., Assistant United States Attorney, Columbia, S.C., for appellee.
 On Brief: E. Bart Daniel, United States Attorney, Columbia, S.C., for appellee.
 D.S.C.
 AFFIRMED.
 Before WIDENER and SPROUSE, Circuit Judges, and HERBERT F. MURRAY, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Ricky Dingle and Earl Scott appeal their sentences in the United States District Court for conspiracy and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 841(b)(1)(C), 845(a), and 846; and 18 U.S.C. § 2. Finding no merit to any of their assertions of error, we affirm.
 
 
 2
 Dingle and Scott were the subjects of a prolonged investigation conducted by the South Carolina Law Enforcement Division (SLED), as a result of a tip provided by an informant that Dingle and Scott were dealing drugs around the Orangeburg area of South Carolina. The investigation utilized an undercover informant who purchased cocaine from Dingle and Scott and recorded their conversations. Ultimately, they were indicted in a five-count federal indictment consisting of one count of conspiracy and four counts of possession with intent to distribute cocaine. Both were charged with conspiracy, distributing two ounces of cocaine within 1,000 feet of an elementary school, and distribution of nine ounces of cocaine. Scott was additionally charged with distributing two-and-one-half ounces and four ounces of cocaine within 100 feet of a playground.
 
 
 3
 There was no plea agreement, but both defendants pled guilty. At the plea hearing, the prosecutor recited a summary of the evidence against both defendants. The evidence showed that Whetstone, the informant, after being told by Scott that Scott would not consider deals less than $7,000 for a quarter kilo of cocaine, convinced Scott to sell him two ounces of cocaine. On March 2, 1989, Scott made a call from his garage, located next to a playground, to arrange pickup of the drugs. Scott and Dingle met Whetstone later that day near an elementary school and sold him two ounces of cocaine for $2,200. The second transaction occurred on March 8, 1989, when Whetstone called Scott, went to Scott's garage, and purchased two-and-one-half ounces of cocaine.
 
 
 4
 On March 23, 1989, Whetstone made another call to Scott to purchase four ounces of cocaine and went to the garage to give Scott $4,000. Scott then sent another male, known only as "Billy," to get the drugs which were later sold to Whetstone. After the third transaction, an undercover SLED agent discussed a future purchase of cocaine with Scott. On May 15, 1989, Whetstone and the SLED agent went to Scott's garage to make a purchase. When they arrived, Scott directed Dingle to go down the road and exchange the money for cocaine. Dingle agreed and informed Scott that he had more cocaine in his truck than the quarter kilo that Whetstone and the agent had arranged to purchase. The agent later stated that he observed approximately two more kilos of cocaine in the bag from which Dingle retrieved the quarter kilo he sold to the agent.
 
 
 5
 In addition to the four controlled buys, Whetstone and others related further evidence of Scott's drug dealing operation. Whetstone testified that in 1987 Scott told Whetstone that he had purchased a horse from Claude Durr by giving Durr $100,000 plus two kilos of cocaine. In addition, another government witness testified that during a trip he, Scott, Dingle, and others had taken to Florida in February 1989, Scott had purchased five kilos of cocaine from Billy Palmer. The cocaine purchased in the above activities plus the four controlled buys amounted to 9.74 kilos of cocaine. Moreover, Scott admitted, while being interviewed by his probation officer after his guilty plea, that he had sold at least one to two kilos of cocaine per week amounting to approximately 50 kilos of cocaine from 1984 to 1989.
 
 
 6
 Defendants were sentenced on July 24, 1990, pursuant to the Sentencing Guidelines in effect at that time. Dingle received a prison sentence of 121 months as to each count, to run concurrently with each other. Scott was sentenced to 330 months as to each of counts one through four to run concurrently with each other, and 240 months for count five, to run concurrently with the other sentences imposed for the other counts.
 
 
 7
 Dingle challenges only the district court's computation of his base offense level under the Sentencing Guidelines. Scott raises four principal challenges.
 
 
 8
 * Dingle challenges the district court's computation of his base offense level. Although the court acknowledged that Dingle had actual contact with only 311.84 grams of cocaine, it nonetheless held Dingle responsible for 9.74 kilos under the Relevant Conduct provision of Sentencing Guidelines § 1B1.3(a)(1). Dingle contends that he should only be accountable for 311.84 grams, the two ounces sold on March 2 and the nine ounces sold on May 15. The effect of the greater computation was to raise Dingle's base offense level from 22 to 32, U.S.S.G. § 2D1.1(c)(6) and (11), and to subject Dingle to the mandatory minimum ten-year sentence under 21 U.S.C. § 841(b)(1)(A)(ii).
 
 
 9
 The Relevant Conduct provision states that the base offense level will be determined on the basis of:
 
 
 10
 all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.
 
 
 11
 U.S.S.G. § 1B1.3(a)(1) (emphasis added). "Otherwise accountable" is explained in Application Note 1:
 
 
 12
 In the case of criminal activity undertaken in concert with others ... the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly undertaken criminal activity that was reasonably foreseeable by the defendant.
 
 
 13
 (emphasis added). See also U.S.S.G. § 1B1.3(a)(1), Illustration e. For closely-related counts, the base offense level determination also includes "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." § 1B1.3(a)(2). The background notes to subsection 1B1.3(a)(2) explain that for drug distribution cases, quantities of drugs not specified in the conviction should be included to determine the offense level "if they were part of the same course of conduct."
 
 
 14
 We, of course, must accept the district court's determination of facts giving rise to the calculation of the base offense level unless they are clearly erroneous. United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989). Here the court concluded that, as a result of Dingle's actions as Scott's runner and delivery man, he should have reasonably foreseen that Scott was engaged in conduct involving 9.74 kilos of cocaine and that Dingle's conduct was relevant to those transactions. See United States v. Reid, 911 F.2d 1456, 1461-63 (10th Cir.1990), cert. denied, 59 U.S.L.W. 3563 (February 19, 1991). Other evidence accepted by the district court as establishing transactions included the testimony of officers who had observed an additional two kilos of cocaine in Dingle's truck, testimony concerning the purchase of a horse by Scott with two kilos of cocaine, and evidence that Dingle was with Scott in Florida at the time the latter purchased five kilos of cocaine.
 
 
 15
 We think the district court could appropriately review this evidence in its consideration of relevant conduct. U.S.S.G. § 6A1.3(a). See also United States v. Vinson, 886 F.2d 740 (4th Cir.1989), cert. denied, 58 U.S.L.W. 3468 (January 22, 1990) (need only preponderance of evidence of amount of drugs involved and foreseeability of the extent of the overall conspiracy).
 
 II
 
 16
 Scott also objects to the district court's computation of his base offense level. Initially, the presentence report stated that the total amount of cocaine involved was 9.74 kilos, resulting in a base offense level of 32. §§ 2D1.4 and 2D1.1. However, based on Scott's admission to the probation officer preparing the report that he sold one to two kilos of cocaine per week from 1984 through 1989, Scott was held to be responsible for conduct involving at least 50 kilograms of cocaine, and assigned a base level of 36. See U.S.S.G. § 1B1.3. The district court thereafter applied a four-level enhancement for Scott's leadership role in the offense and added a two-level enhancement for the specific offense characteristic of possession of a firearm during the drug trafficking offense. Scott raises four main objections to the calculation of his offense level.
 
 
 17
 First, he argues that the court impermissibly used uncharged conduct and conduct which pre-dated the charged conspiracy in determining the base offense level. This argument is without merit. U.S.S.G. § 1B1.3(a)(2) and background notes; United States v. Williams, 880 F.2d 804 (4th Cir.1989) (additional drugs other than those for which one has been convicted may be included in determining the offense level if they are relevant conduct).
 
 
 18
 Second, Scott argues that the statements made to the probation officer should have been suppressed on fifth and sixth amendment grounds. Scott argues that his sixth amendment right to counsel was violated because no attorney was present during the presentence interview. Although we have not ruled on this discrete issue, we have held that no sixth amendment right to counsel attaches at ex parte presentence conferences between a court and probation officer. We reasoned that, because a probation officer does not play an adversarial role in the ex parte presentence conferences, this is not a critical stage of the sentence proceedings. United States v. Johnson, 935 F.2d 47, 50 (4th Cir.1991). In agreement with the majority of circuits, we also find this reasoning persuasive when applied to presentence interviews. See United States v. Woods, 907 F.2d 1540, 1543 (5th Cir.1990), cert. denied, 59 U.S.L.W. 3502 (January 22, 1991); United States v. Rogers, 899 F.2d 917, 919 (10th Cir.1990). But see United States v. Saenz, 915 F.2d 1046, 1048 (6th Cir.1990).
 
 
 19
 Scott also argues that his fifth amendment right to be free from self-incrimination was violated because he was never informed that he had a right to remain silent. Here too, the general rule is contrary to Scott's contention--a defendant is not entitled to Miranda -type warnings at routine post-conviction presentence interviews. United States v. Cortes, 922 F.2d 123, 126 (2d Cir.1990); United States v. Davis, 919 F.2d 1181, 1186 (6th Cir.1990); United States v. Rogers, 899 F.2d 917, 921 (10th Cir.1990); United States v. Jackson, 886 F.2d 838, 841-42 n. 4 (7th Cir.1989); Baumann v. United States, 692 F.23 565, 575-77 (9th Cir.1982). We agree with this general rule and the rationale discussed by these circuits. Moreover, here there was no evidence that the admissions were involuntary or coerced. The probation officer merely instructed Scott that he wanted only truthful information.
 
 
 20
 Third, Scott objects to the four-level enhancement added because of his role in the offense as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(a). The determination that a defendant was an organizer or leader in the offense is essentially a factual question. United States v. Smith, 914 F.2d 565, 569 (4th Cir.1990), cert. denied, 59 U.S.L.W. 3563 (February 19, 1991).
 
 
 21
 Again, there are sufficient facts to support the court's conclusion. Scott was Dingle's supervisor, in addition to the supervisor of at least one other runner, "Billy." He was a supplier to a number of people over which he exerted control based on their financial debts to him. See United States v. Fells, 920 F.2d 1179, 1182-83 (4th Cir.1990), cert. denied, 59 U.S.L.W. 3838 (June 17, 1991). Even if there were not five participants in this particular scheme, the four-level enhancement would be proper because the district court found that the criminal activity was "otherwise extensive" as is required by Guideline § 3B1.1(a).
 
 
 22
 Fourth, Scott disputes the two-level enhancement for the possession of a firearm in furtherance of the drug-trafficking activity pursuant to U.S.S.G. § 2D1.1(b)(1). Application note 3 to U.S.S.G. § 2D1.1(b)(1) states that if a gun was present, the sentencing court should add an enhancement "unless it is clearly improbable that the weapon was connected with the offense." "Presence of a weapon" as used in the Guidelines has been given a liberal interpretation by this court. United States v. Paz, 927 F.2d 176, 178-79 (4th Cir.1991) (gun underneath mattress); United States v. White, 875 F.2d 427, 433 (4th Cir.1989) (firearm found under seat of car).
 
 
 23
 Eighteen weapons were discovered during a search of Scott's house, including an Uzi 9mm semi-automatic weapon. Although weapons were never seen during transactions with the agents and informant and no drugs were found in Scott's house, numerous drug trafficking documents were seized pursuant to the search of Scott's house, indicating it was used to further his drug transactions. We think the two-level enhancement was appropriate.
 
 
 24
 For the reasons stated, we affirm Scott's sentence.
 
 
 25
 AFFIRMED.