947 F.2d 946
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Earnest SEALE, Jr., aka E.J., et al. (89-4098), William
McCrady (90-3007), Lester Ware, aka Larry Lester (90-3008),
Crystal Woodard (90-3014), Edward Sylvester Gray (90-3209),
William McCrady (90-3211), Michael Jerome Davis (90-3215)
and Thomas A. Walker, aka Tony Walker, Defendants-Appellants.
 Nos. 89-4098, 90-3007, 90-3008, 90-3014, 90-3209, 90-3211,
90-3215 and 90-3216.
 United States Court of Appeals, Sixth Circuit.
 Oct. 31, 1991.
 
 Before NATHANIEL R. JONES and SUHRHEINRICH, Circuit Judges, and TODD, District Judge.*
 PER CURIAM.
 
 
 1
 Earnest Seal, Jr., William McCrady, Lester Ware, Crystal Woodard, Edward S. Gray, Michael Davis and Thomas Anthony Walker are defendants-appellants in this consolidated appeal. They appeal their drug-related convictions and sentences. For the following reasons, we affirm the district court's disposition of their cases.
 
 I.
 
 2
 These cases center on a conspiracy to distribute and to possess with intent to distribute cocaine and crack cocaine in the city of Akron, Ohio. The conspiracy involved appellants and about twenty-two other codefendants named in the indictment.
 
 
 3
 As early as March 1988, and continuing until June 1989, members of the Crips Street Gang, based in Los Angeles, California, arrived in Akron, Ohio, for the purpose of taking over the cocaine and crack cocaine distribution in the city. During the course of their stay in Akron, these gang members developed relationships with Akron residents in furtherance of their cocaine operation. They engaged in a pattern of activity to secure locations from which to sell their cocaine and crack cocaine, and used local residents to obtain housing, utilities, telephones, paging devices, firearms, and vehicles. Each of the appellants was associated with the conspiracy and each other in some way.
 
 
 4
 Walker and Woodard, both Akron residents, distributed cocaine from Woodard's residence located in an inner-city housing development. Davis, also an Akron resident, used his residence in assisting the gang members to distribute cocaine and to pursue other cocaine-related activity. Other residents were used to sell cocaine by a number of defendants and coconspirators.
 
 
 5
 Law enforcement surveillance and court-authorized wire interceptions established the extent of the conspiracy, drug distribution locations, and the various connections among the defendants involved. Controlled purchases of cocaine and crack cocaine were made through the use of an informant, Detective Charles Rowland of the Summit County Sheriff's Department, and Agent Larry Fordo of the Bureau of Alcohol, Tobacco and Firearms.
 
 
 6
 Seal arrived in Akron in the fall of 1988 or in the spring of 1989 and identified himself as a member of the Crips gang. Yolanda Folk and Dawn Brooks, both Akron residents, bought cocaine from Seal on numerous occasions. Folk also sent money transfers to California at Seal's request. Seal sold crack cocaine to a government informant, Sam Chamness, on approximately forty occasions. In addition, at trial a number of other witnesses detailed their purchases of cocaine from Seal. Seal sold cocaine from the residences of Terri Peake and Willie Little.
 
 
 7
 McCrady arrived in Akron in the fall of 1988. McCrady made public knowledge of the fact that he was a member of the Crips gang. McCrady distributed crack cocaine from a number of locations. Chamness purchased cocaine from McCrady on a number of occasions at two different Akron residences. On April 3, 1989, McCrady sold Terri Peake six pieces of crack cocaine. McCrady carried a firearm when dealing in cocaine.
 
 
 8
 Ware arrived in Akron in the early part of 1989. Ware associated often with the other appellants and codefendants and identified himself as a member of the gang. Ware was observed selling cocaine from a Fifth Avenue location on five or six occasions. A firearm was observed at this location. Ware was intercepted in telephone conversations in which reference was made to a shipment being on its way. Other taped conversations implicated Ware as well.
 
 
 9
 Gray arrived in Akron in the summer of 1988. Gray was responsible for the rental of several houses that were used as crack houses by members of the conspiracy. He rented the houses through two local residents, Pamela and Mary Brown. He distributed cocaine from a number of other locations from August 1988 to June 1, 1989. Agent Larry Ford made several undercover purchases from Gray at different locations. At one transaction between Gray and Ford, a revolver was on the coffee table. Dawn Brooks, Collie Brooks, and Sharon Thomas also purchased cocaine from Gray. He was observed by Diane Hardison on more than ten occasions selling crack cocaine from a Coventry Road residence. Beginning in the spring of 1988, Terri Peake was supplied with cocaine by Gray. Gray also supplied Mary Brown. A number of Gray's phone conversations relating to the distribution of cocaine were intercepted.
 
 
 10
 Davis, an Akron resident, distributed cocaine and crack cocaine from his residence. Davis's operation was connected with other gang cocaine houses. On January 10, 1989, Agent Ford purchased crack cocaine from Davis's home. On many occasions, Davis directed Ford to other locations where he could purchase crack cocaine. Once Davis directed Ford to a house to buy cocaine, and during the purchase, a gun was in plain view. Davis also showed Ford how to convert powdered cocaine into crack cocaine. Sharon Thomas, a coconspirator and Davis's girlfriend, observed cocaine at Davis's residence and purchased it from him and others at his home. In fact, during the winter of 1988, he actually sold cocaine from Thomas's home. She sold cocaine for him on a number of occasions. Davis was intercepted in phone conversations involving the cocaine conspiracy.
 
 
 11
 On June 28, 1989, a federal grand jury in the Northern District of Ohio returned a fifty-five-count indictment charging appellants Seal, McCrady, Ware, Gray, Davis, Walker, and Woodard with drug-related offenses. A superseding seventy-five-count indictment against the appellants was returned on July 26, 1989. Count one charged each of the appellants with conspiracy to distribute and possess with the intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. 846 (1988). In addition, each of the appellants was charged in other counts with drug-related offenses.
 
 
 12
 On August 28, 1989, a jury trial of eleven defendants, including the appellants herein, began. Prior to the trial's conclusion, four defendants, Derrick T. Neal, James Chambers, Walker, and Woodard, entered pleas of guilty. Walker and Woodard entered guilty pleas on September 25, 1989.
 
 
 13
 The trial concluded on September 26, 1989, and two days later, the jury returned verdicts of guilty as follows: each of the appellants was found guilty of the conspiracy charged in count one; Seal was found guilty as charged in count thirty-three of distribution of crack cocaine, in violation of 21 U.S.C. 841(a)(1) and 18 U.S.C. 2; McCrady was found guilty as charged in counts thirty-eight and sixty-three of use of a communication facility to facilitate the commission of a drug trafficking crime, in violation of 21 U.S.C. 843(b); Gray was found guilty as charged in count thirty-five of use of a firearm during the commission of a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1) and 18 U.S.C. 2, in counts thirty-four and fifty-two of use of a communication facility to facilitate the commission of a drug trafficking crime, in violation of 21 U.S.C. 843(b), and in count forty-five for possession of cocaine with intent to distribute, in violation of 21 U.S.C. 841(a)(1) and 18 U.S.C. 2; Davis was found guilty as charged in counts thirty-one and forty-six for use of a communication facility to facilitate the commission of a drug trafficking crime, in violation of 21 U.S.C. 843(b), in count thirty-five for use of a firearm during a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1) and 18 U.S.C. 2, and in count thirty-six for possession of cocaine with intent to distribute, in violation of 21 U.S.C. 841(a)(1) and 18 U.S.C. 2; Walker entered a plea of guilty to count one, and the remaining counts against him were dismissed; Woodard entered pleas of guilty to the conspiracy in count one and also to count seventy-five, possession of a firearm during the commission of a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1), and the remaining counts against her were dismissed. The court found that the United States Sentencing Guidelines ("U.S.S.G.") were applicable to this case and sentenced the appellants accordingly. This appeal followed.
 
 II.
 
 14
 The first issue on appeal is whether the trial court erred in denying Seal's motions for continuance. Seal moved the court for continuances on the ground that additional time was required to prepare for the trial.
 
 
 15
 "We review issues relating to denials of requests for continuances under an abuse of discretion standard." United States v. Sawyers, 902 F.2d 1217, 1219 (6th Cir.1990), cert. denied, 111 S.Ct. 2895 (1991). Further, the Supreme Court has stated that broad discretion must be granted trial courts on matters of continuances. Morris v. Slappy, 461 U.S. 1, 11 (1983). Denial amounts to a constitutional violation only if there is an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay." Id. at 11-12. " 'To demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense.' " United States v. Gallo, 763 F.2d 1504, 1523 (6th Cir.1985), cert. denied sub nom. Graewe v. United States, 474 U.S. 1068 and 474 U.S. 1069 (1986), and reh'g granted in part, denied in part sub nom. United States v. Graewe, 774 F.2d 106 (6th Cir.1985), cert. denied sub nom. Gallo v. United States, 475 U.S. 1017 (1986) (quoting United States v. Mitchell, 744 F.2d 701, 704 (9th Cir.1984).
 
 
 16
 Seal filed motions for continuance on July 21, 1989 and August 14, 1989. Seal listed the following grounds for his motions: (1) two separate indictments were pending against him; (2) discovery had not sufficiently been supplied; (3) a ninety-page affidavit had been filed listing numerous names, addresses, and telephone numbers, and he needed time to digest it; (4) voluminous applications for wire intercepts were released to counsel on July 19, 1989; and (5) twelve boxes of cassette tapes from the FBI were delivered to counsel on July 20, 1989. Given these and other constraints, defense counsel argues that it was impossible to prepare an adequate defense in the time available.
 
 
 17
 Seal was originally named in count one of a fifty-five count indictment, which was returned on June 28, 1989. Count one of the indictment was the conspiracy count, the major charge in the indictment. The case was set for trial to commence on August 21, 1989. Seal had been in custody since June 1, 1989. Upon the return of a seventy-five count superseding indictment on July 26, 1989, which named Seal in three counts, the court rescheduled the trial for August 28, 1989.
 
 
 18
 Seal was appointed counsel prior to his appearance before the magistrate for his detention and preliminary hearing on June 5, 1989. The attorney that represented Seal at the June 5, 1989 hearing represented him throughout the duration of the case.
 
 
 19
 Because the conspiracy included thirty defendants, the court severed the case into two trials. The first group, which included Seal, was composed of all pre-trial detainees and those unable to post bond. At the time the first trial commenced, only eleven defendants remained in the first group. Prior to the conclusion of the trial, four of the eleven defendants had entered pleas of guilty.
 
 
 20
 Our review of the record indicates that the government complied with all discovery requests in accordance with the trial court's order. Seal was provided information by the government with ample time to prepare for effective cross-examination of the government's witnesses and also presented witnesses on his behalf. Given the complexity and size of this case, the request for a continuance may well have been reasonable. However, our review is for abuse of discretion and actual prejudice. Seal does not claim actual prejudice. For instance, he does not argue that he was unable to properly review certain evidence nor that the trial court's rulings actually prejudiced his right to a fair trial. He simply argues that the denials constituted error per se. Absent a showing of actual prejudice, this claim must fail.
 
 III.
 
 21
 The second issue is whether the trial court erred in denying the motions for severance made by Seal, Ware and Davis. We think not.
 
 
 22
 We review the trial court's failure to sever under an abuse of discretion standard. United States v. Gallo, 763 F.2d 1504, 1523 (6th Cir.1985), cert. denied sub nom. Graewe v. United States, 474 U.S. 1068 and 474 U.S. 1069 (1986), and reh'g granted in part, denied in part sub nom. United States v. Graewe, 774 F.2d 106 (6th Cir.1985), cert. denied sub nom. Gallo v. United States, 475 U.S. 1017 (1986) (quoting United States v. Mitchell, 744 F.2d 701, 704 (9th Cir.1984). In order to succeed on a severance contention, "the defendant has the heavy burden of showing specific and compelling prejudice resulting from a joint trial which can be rectified only by separate trials." United States v. Dempsey, 733 F.2d 392, 398 (6th Cir.), cert. denied, 469 U.S. 983 (1984) (quoting United States v. Howell, 664 F.2d 101, 106 (5th Cir.1981), cert. denied, 455 U.S. 1005 (1982)). Moreover, in conspiracy cases, such as the one alleged against Seal, Ware and Davis, persons indicted together are generally tried together. United States v. Licavoli, 725 F.2d 1040, 1051 (6th Cir.), cert. denied sub nom. Liberatore v. United States, sub nom. Licavoli v. United States, and sub nom. Calandra v. United States, 467 U.S. 1252 (1984).
 
 
 23
 Seal and Ware contend that their motions for severance should have been granted due to the nature and complexity of this case and the "spillover effect" involved. The fact that the trial involved several defendants is, standing alone, an insufficient ground for severance. Rather, "spillover" has been found to occur only when "the numbers of conspiracies and conspirators involved were too great for the jury to give each defendant the separate and individual consideration ... to which he was entitled." Gallo, 763 F.2d at 1526 (quoting United States v. Tolliver, 541 F.2d 958, 962 (2d Cir.1976). This case is easily distinguished from the Gallo case and the precedent it cites, in that in those cases, multiple conspiracies were also involved. Here, only one conspiracy has been alleged by the government, and Seal and Ware do not challenge that allegation. Thus, the simple fact that 11 defendants were tried together does not constitute prejudice to the defendants. As we have stated previously, "[m]erely because inflammatory evidence is admitted against one defendant, not directly involving another codefendant (and with which the other is not charged) does not, in and of itself, show substantial prejudice in the latter's trial." Id. at 1525. See also United States v. Causey, 834 F.2d 1277, 1288 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988) ("[A] defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him.").
 
 
 24
 Seal and Ware also contend that the denial of their severance motions prevented them from calling codefendants as witnesses. The record does not show that any of the codefendants would have testified on behalf of Seal or Ware, nor does it reflect the substance of such testimony. To prevail, defendants must show, inter alia, that they would have called codefendants at a separate trial, that they would have testified, and that the testimony would have been exculpatory. Causey, 834 F.2d at 1287. This the defendants fail to do.
 
 
 25
 Davis argues that the denial of his motion for severance prevented him from presenting evidence in his defense out of fear of retaliation from his codefendants. The evidence that Davis alleges he would have presented involved four separate phone calls, which he made to the Akron Police Department on April 5, April 29, May 2, and May 5, 1989, in order to inform them of the Crips gang's drug activities. Davis states that while in prison awaiting trial, he was attacked by co-defendants. He also alleges that threats were made upon his family. It appears that Davis is arguing that he was "coerced" into being a part of the Akron conspiracy, and contends that his fears made it impossible to obtain a fair trial.
 
 
 26
 Davis has not shown how the evidence of the phone calls would have substantially aided his defense. In fact, the record reveals, and the trial court recognized, that the government was well prepared, should it have been necessary, to rebut any arguments in Davis's defense based upon the phone calls to the police. Supp.J.A. at 101-04. Thus, he has failed to show specific and compelling prejudice as required under Gallo. More importantly, Davis did not move for a severance until well after trial had begun. At oral argument, his counsel stated that the decision to forego a motion for severance prior to the start of trial was a "strategic decision." Davis's strategic move was his to make, and we cannot act to remedy bad trial strategy.
 
 IV.
 
 27
 The third issue raised is whether the trial court erred in applying the U.S.S.G. Seal, McCrady, Gray, Walker, and Ware each argue that the district court erred in its application of the guidelines. To the extent that defendants challenge factual findings made by the trial judge in his application of the guidelines, we review for clear error. United States v. Duque, 883 F.2d 43, 44-45 (6th Cir.1989).
 
 A.
 
 28
 Seal contends that the district court erred in departing upward and applying a Criminal History Category of IV instead of III. Seal claims that the district judge failed to adequately articulate sufficient reasons for departing upward. We disagree.
 
 
 29
 "A district court is permitted to depart from a Guidelines-specified sentence only when it finds 'an aggravating or mitigating circumstance ... that was not adequately taken into consideration by the Sentencing Commission....' " United States v. Anders, 899 F.2d 570, 578 (6th Cir.), cert. denied sub nom. Weddle v. United States, 111 S.Ct. 532 (1990) (quoting 18 U.S.C. 3553(b)). The guidelines require that the sentencing court provide specific reasons for any departure. 18 U.S.C. 3553(c)(2); United States v. Fitzwater, 896 F.2d 1009, 1011 (6th Cir.1990).
 
 
 30
 In United States v. Joan, 883 F.2d 491 (6th Cir.1989), this court set forth a three-step analysis for reviewing sentences that depart from the guidelines:
 
 
 31
 The first step is a question of law regarding whether the circumstances of the case are sufficiently unusual to justify departure. Step two involves a determination as to whether there is an actual factual basis justifying the departure. Here, the standard is whether the determination made involves clear error.
 
 
 32
 ....
 
 
 33
 The third step is that, once the Court has assured itself that the sentencing court considered circumstances appropriate to the departure, the degree of departure must be measured by a standard of reasonableness on appeal....
 
 
 34
 Id. at 494-96. The guidelines state: "If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range." U.S.S.G. 4A1.3.
 
 
 35
 Initially, the sentencing court determined Seal's Criminal History Category to be III. Over Seal's objection, however, the court departed upward to category IV because his "criminal record was not adequately reflected in a Criminal History Category of III due to his proclivity for violence when confronted in the commission of a drug or theft offense level." J.A. at 176. Seal maintains that "[t]he only information relied on by the sentencing court for its departure from the guidelines was Defendants past criminal history," Brief of Appellant Seal at 10, and thus that the departure fails step one of the Joan test because Seal's past criminal conduct was not sufficiently unusual to warrant an upward departure.
 
 
 36
 Upon careful review, we find that the court's upward departure meets each step of the Joan test. The court relied on U.S.S.G. 4A1.2, comment. (n. 3), as authority for his decision. That commentary warns that
 
 
 37
 there may be instances in which this definition [of 'related' cases as including those 'part of a single common scheme or plan'] is overly broad and will result in a criminal history score that underrepresents the seriousness of the defendant's criminal history and the danger that he presents to the public.... In such circumstances, the court should consider whether departure is warranted.
 
 
 38
 Id. The sentencing judge was persuaded of the appropriateness of a departure in this case by evidence of Seal's violent nature; Seal had committed a violent act in connection with each of his previous convictions for drug offenses and theft. Contrary to Seal's contention, a sentencing judge may rely on a defendant's past criminal history to justify an upward departure if reliable information indicates that the criminal history does not adequately reflect the seriousness of the defendant's past criminal conduct. Seal does not contend that the information concerning his past criminal history, upon which the sentencing judge relied, was unreliable. Finding that the actual circumstances of the defendant's criminal history justify a departure and that the departure was reasonable, we affirm.
 
 B.
 
 39
 McCrady contends that the sentencing judge erred in finding that he was a manager or supervisor. Again, we think not.
 
 
 40
 The government recommended at the sentencing hearing that Mccrady's base offense level be increased pursuant to U.S.S.G. 3B1.1(a), which provides that the offense level should be increased four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The sentencing judge did not accept the government's recommendation. J.A. at 545.
 
 
 41
 Section 3B1.1(c) provides that a defendant's base offense level should be increased by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." The court found that Mccrady's role in the offense fell within 3B1.1(c) and increased by two his offense level.
 
 
 42
 With regard to a defendant's role in the offense, our standard of review is clearly erroneous. United States v. Silverman, 889 F.2d 1531, 1540 (6th Cir.1989). The evidence presented at trial showed that McCrady had recruited a number of persons to help him distribute cocaine, and revealed that McCrady sold a substantial amount of cocaine and operated as a major supplier. Further, there was testimony that McCrady gave orders to other gang members from Los Angeles. As our review here is for clear error, we affirm.
 
 C.
 
 43
 Gray argues that the sentencing judge erred in its denial of a two level reduction for acceptance of responsibility. U.S.S.G. 3E1.1 allows a two-level reduction "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct."
 
 
 44
 Regarding whether a defendant has accepted personal responsibility for his criminal activity, this court has adopted the view that the sentencing judge's determination is entitled to great deference on review because the assessment of a defendant's contrition will depend heavily on credibility assessments, and therefore, that a sentencing judge's determination here will not be disturbed unless it is without foundation or is clearly erroneous. United States v. Carroll, 893 F.2d 1502, 1511 (6th Cir.1990); see U.S.S.G. 3E1.1, comment. (n. 5).
 
 
 45
 Gray maintains that "he should have been granted the reduction based upon his admission to the two counts of distribution during closing argument." Brief of Appellant Gray at 15. To this argument the sentencing judge stated:
 
 
 46
 He acknowledged them in the sense that he didn't put any testimony to rebut the claims of the Government. And you conceded in final argument that the evidence was there. But in my view that is not sufficient to justify a two level reduction for acceptance of responsibility[.]
 
 
 47
 Supp.J.A. at 31.
 
 
 48
 The acceptance of responsibility reduction is, according to the commentary to 3E1.1, "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."[1] That commentary also indicates that one of the factors the court may appropriately consider in determining that the reduction is proper is "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." U.S.S.G. 3E1.1, comment. (n. 1(g)). Given this guidance, the court could reasonably have found that the reduction was not appropriate in Gray's case. As our review here is for clear error, we affirm.
 
 D.
 
 49
 McCrady, Walker and Ware contend that the sentencing court erred in determining their base offense levels. The court determined that the base offense level for McCrady and Walker was 32 and for Ware was 28.
 
 
 50
 To establish a level of 32 under U.S.S.G. 2D1.1, an amount of 50 to 150 grams of cocaine base (crack) or 5 to 15 kilograms of cocaine must be proven. With respect to McCrady and Walker, the evidence at trial met this requirement. Indeed, the court found with respect to Mccrady that the "[e]vidence is overwhelming that defendant was part of conspiracy, & the crack cocaine was of an amount in excess of 50 grams." J.A. at 170. Similarly, strong evidence supported Walker's base offense level. On June 1, 1989, Walker was arrested with 25.84 grams of crack cocaine and 86 grams of cocaine powder. Defendant Woodard, who was supplied by Walker, was arrested the same day possessing 24.26 grams of crack cocaine. Further, trial testimony showed that Walker and McCrady were coconspirators and that McCrady supplied Walker. Also, there was testimony at trial showing that Walker and McCrady distributed cocaine in conjunction at different locations and sometimes together at the same locations. Therefore, we find ample support in the record to justify Walker's and *McGrady's base offense levels of 32.
 
 
 51
 To support a base offense level of 28 against Ware, an amount of 20 to 35 grams of crack cocaine or 2 to 3.5 kilograms of cocaine powder must be proven. Ware was substantially connected to several locations of the conspiracy, including the Fifth Avenue location in Akron, which was one of the more active distribution houses. Testimony at trial and at the sentencing hearing also established that Ware stated in a telephone conversation that he could sell three or four ounces in a day. Supp.J.A. at 57 (Ware Sentencing). One ounce converts to 28 grams. Finally, Ware was observed selling crack cocaine on five or six occasions at the Fifth Avenue address. This amount alone supports the sentencing judge's finding of more than 20 grams.
 
 
 52
 On the record before us, we cannot say that the trial judge committed clear error in determining the foregoing offense levels. This is so even without consideration of the other cocaine and cocaine base involved in the Akron conspiracy.
 
 V.
 
 53
 McCrady argues that the trial court erred in permitting the government to cross-examine two witnesses concerning his criminal record. We review alleged evidentiary errors for abuse of discretion. United States v. Levy, 904 F.2d 1026, 1029 (6th Cir.1990), cert. denied sub nom. Black v. United States, 111 S.Ct. 974 (1991).
 
 
 54
 McCrady gave his own opening statement. McCrady stated that he moved from Los Angeles to Akron to get away from violence and crime. He stated that "I never operated dope in my life or whatsoever." Supp.J.A. at 113. In reference to the trial, McCrady stated that "I am kind of nervous because I'd never been in a predicament like this." Id. at 116. McCrady presented testimony from his parents, whom the government cross-examined, supporting his good character and the fact that they had never seen him with firearms or drugs. Mrs. McCrady described her son as "an ordinary mother's boy." Id. at 117-18. McCrady next asked his father if he had a "clean record," to which his father responded "Yes." Id. at 121. Thereafter, the government cross-examined Mccrady's parents. His mother was asked whether she knew if McCrady had been convicted of the offenses of robbery with the use of a firearm and burglary, and had spent time in prison. Mccrady's father was asked if he knew that his son had been charged with a parole violation.
 
 
 55
 The government contends that McCrady "opened the door" to the challenged evidence. We agree. "Once the defendant has 'opened the door' by offering evidence as to his good character, the prosecution may rebut that evidence." United States v. McGuire, 744 F.2d 1197, 1204 (6th Cir.1984), cert. denied sub nom. Lee v. United States, and sub nom. McGuire v. United States, 471 U.S. 1004 (1985). Further, contrary to Mccrady's contention, the court gave a limiting instruction concerning the government's cross-examination of his parents:
 
 
 56
 The prosecution asked certain questions on cross-examination about defendant's character witness about specific acts supposedly committed by the defendant. I caution you that the prosecution was allowed to ask these questions only to help you decide whether the witness was accurate in forming his opinion or in describing the reputation of the defendant's character.
 
 
 57
 You may not assume that the acts described in these questions are true, nor may you consider them as evidence that the defendant has committed the crime for which he is charged. You may therefore, consider the questions only in deciding what [weight], if any, should be given to the testimony of the character witnesses and for no other purpose. You should not consider such questions as any proof of the conduct stated in the question.
 
 
 58
 J.A. at 527-28. We find no abuse of discretion here by the trial court.
 
 VI.
 
 59
 The next issue raised is whether the evidence is sufficient to sustain the convictions against McCrady, Gray, and Davis. The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 60
 McCrady and Davis challenge their convictions for conspiracy to possess with intent to distribute cocaine and cocaine base and use of a communication facility to facilitate the commission of a drug trafficking crime. Gray and Davis challenge their convictions for use of a firearm during the commission of a drug trafficking offense and aiding and abetting.
 
 
 61
 To obtain a conviction for conspiracy under 21 U.S.C. 846, the government must prove the existence of an agreement to violate the drug laws, that each conspirator knew of and intended to join the conspiracy, and that each conspirator participated in the conspiracy. United States v. Pearce, 912 F.2d 159, 161 (6th Cir.1990), cert. denied sub. nom. Thorpe v. United States, 111 S.Ct. 978 (1991). It is not necessary to prove the commission of an overt act. United States v. Dempsey, 733 F.2d 392, 396 (6th Cir.), cert. denied, 469 U.S. 983 (1984). Finally, every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as every member is a party to the general conspiratorial agreement. United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986).
 
 
 62
 A review of the testimony presented at trial reveals these challenges to be without merit. Both McCrady and Davis were connected to several distribution houses in Akron, including the Fifth Avenue distribution house. Both were observed in the presence of the other at different distribution houses and in the presence of other coconspirators. Both McCrady and Davis were sellers and suppliers in the conspiratorial operation in Akron. Finally, McCrady, Davis, and Gray were intercepted in numerous cocaine-related telephone conversations regarding the Akron cocaine operation. Given the overwhelming evidence presented against these defendants at trial, any rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt.
 
 
 63
 Likewise, Gray's and Davis's challenges to their convictions for possession of a firearm during the commission of a drug trafficking offense and aiding and abetting must fail. The government must merely prove, beyond a reasonable doubt, that the defendants both associated and participated in the use of the firearm in connection with the underlying crime. See Nye & Nissen v. United States, 336 U.S. 613, 619 (1949); United States v. Hughes, 891 F.2d 597, 599 (6th Cir.1989). The evidence showed that Davis took Agent Ford to one of the distribution houses to purchase cocaine from Gray. During this transaction, Agent Ford observed a firearm on a coffee table in close proximity. Davis not only took Ford to the house in order to purchase cocaine but actually identified the caliber of the weapon. This evidence supported the charges against Gray and Davis.
 
 VII.
 
 64
 Davis claims that the trial court erred in denying his motion for a mistrial. "We review a district court's denial of a motion for a mistrial for abuse of discretion." United States v. Levy, 904 F.2d 1026, 1030 (6th Cir.1990), cert. denied sub nom. Black v. United States, 111 S.Ct. 974 (1991). "A determination of whether the accused received a fair trial is the primary concern in ruling upon a mistrial motion." United States v. Atisha, 804 F.2d 920, 926 (6th Cir.1986), cert. denied, 479 U.S. 1067 (1987).
 
 
 65
 Before any evidence was presented in the case, one of the jurors called the clerk's office and expressed a fear in continued participation in the trial. The juror's fear was caused by inadvertently listening to a radio account of the case. The judge examined the juror, and both he and the juror concluded that there was no rational basis for the fear. The juror stated that she could be fair and impartial during the trial. The juror's only communication concerning this matter was with the judge and the person who answered the phone in the clerk's office.
 
 
 66
 In dismissing the juror, the judge announced to the defendants and defense counsel that one of the jurors had "developed a fear" and was dismissed. Davis complains here that the juror was dismissed without explanation or inquiry, and that the defendants should have been allowed to voir dire other jurors to see if they had been tainted by the "fearing" juror.
 
 
 67
 Three defendants were representing themselves at this point. Therefore, a voir dire would have necessitated questioning by a defendant. Under these circumstances, the trial judge removed the juror and denied the motion for mistrial. The record reveals no abuse of discretion on the part of the trial judge, nor does the record reveal any actual prejudice against Davis.
 
 VIII.
 
 68
 The final issue is whether 18 U.S.C. 924(c)(1) violates the Due Process Clause of the Fifth Amendment by failing to include a mens rea requirement. 18 U.S.C. 924(c)(1) provides: "Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years...." As shown above, the section does not "expressly" require mens rea.
 
 
 69
 While this court has not previously considered a due process challenge involving 924, we are persuaded that the analysis applied to 21 U.S.C. 845a in United States v. Cross, 900 F.2d 66 (6th Cir.1990), must be applied here as well. In Cross, this court held that 21 U.S.C. 845a did not violate due process due to its lack of a mens rea requirement. Id. at 69. We recognized the principle of Liparota v. United States, 471 U.S. 419, 427 (1985), that ambiguity concerning the ambit of criminal statutes should be resolved in favor of the rule of lenity where it does not conflict with the implied or expressed intent of Congress. Cross, 900 F.2d at 69. We found, however, that the congressional intent to deter distribution of drugs in or around schools supported the conclusion that Congress had not incorporated any mens rea requirement into the statute." Id. Further, we found that one had to be guilty under 21 U.S.C. 841(a)(1)--which does contain a mens rea requirement--in order for 845a to apply; thus, the section does not "criminalize otherwise innocent activity." Id. Therefore, we held that 845a did not violate due process.
 
 
 70
 We find that these considerations support the conclusion that Congress has not incorporated a mens rea requirement into 924(c)(1). The purpose of that section is to deter violence in connection with drug distribution. The section only applies to those found guilty of committing a crime of violence or a drug trafficking offense, crimes which have mens rea requirements in the first instance.
 
 
 71
 Although we are constrained to follow circuit precedent in this instance, we must register our displeasure with having to add another ruling to the body of recent case law in the area of criminal law which is steadily undermining the individual rights of all citizens. This decision increases the likelihood of a defendant's conduct being found criminal, where an express mens rea requirement might well exclude that conduct from that category. Based, however, on our holding in the analogous case, Cross, we must find that 924 is not violative of due process.[2] Accordingly, we AFFIRM the convictions and sentences.
 
 
 
 *
 The Honorable James Dale Tood, District Judge of the United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 There are, however, instances in which a defendant's conviction by trial does not preclude a court from granting her a reduction for the acceptance of responsibility. See U.S.S.G. 3E1.1, comment. (n. 2)
 
 
 [2]
 Defendants-appellants raised other issues. After careful consideration of these issues and after the benefit of oral argument, we find them to be without merit